Gary B. MARTIN *v.* STATE of Arkansas

CR 00-1382 57 S.W.3d 136

Supreme Court of Arkansas
Opinion delivered October 11, 2001
[Petition for rehearing denied November 15, 2001.]

*Ellen Lester Reif,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Clayton K. Hodges,* Ass't Att'y Gen., for appellee.

T OM GLAZE, Justice. Gary Martin was convicted of first-degree murder and sentenced to life in prison for the 1998 killing of Kimberly Burris. Martin raises two points on appeal; neither has merit, and we affirm his conviction.

■■ For his first point on appeal, Martin argues that the trial court erred in denying his motion for directed verdict. Particularly, Martin contends that there was insufficient evidence to corroborate the statement of an accomplice, Yolonda Day, who gave several statements to authorities in Arkansas and in St. Louis, Missouri, that she had witnessed the murder. We treat motions for directed verdict as challenges to the sufficiency of the evidence. *McGehee v. State,* 338 Ark. 152, 992 S.W.2d 110 (1999) (citing *Marta v. State,* 336 Ark. 67, 983 S.W.2d 924 (1999)). When reviewing the sufficiency of the evidence, we determine whether there is substantial evidence to support the verdict, viewing the evidence in a light most favorable to the State. *Id.*

Kimberly Burris disappeared from North Little Rock around July 20, 1998. Her remains were discovered in a freezer in an abandoned house in Lonoke County on November 15, 1998. Gary Martin was arrested and charged with Burris's murder on March 18, 1999, after police received information linking him with Burris's disappearance. The bases of the charges against Martin included statements given by a woman named Yolonda Day. Lonoke County authorities learned that Day was in the St. Louis, Missouri area, and contacted the police in St. Louis, who, in turn, picked up Day on April 26, 1999, and questioned her about Burris's murder. That same day, St. Louis Detective Robert Jordan videotaped his interview with Day. Day stated that she did not remember the exact day of the events, but said that she and Gary Martin and two other men — Elton Simms and Lester Perry — were driving in North Little Rock when they picked up Burris on Main Street. Martin said that they needed to take a ride, so they drove to an abandoned house in Lonoke. While in the living room of the house, the group was smoking crack cocaine, when Martin told Burris that he needed to talk to her; the two left the room and went back to a bedroom. About fifteen or twenty minutes later, Day said she heard a scream. She, along with Simms and Perry, went to see what had happened, and they discovered Burris lying in a pool of blood and Martin

standing over her with a knife in his hand. Day related that Martin then took some duct tape and rope, put the tape on Burris's mouth, and "hog-tied her and . . . stuffed her in the freezer."

In her interview, Day described the route by which the group drove to the Lonoke house, and provided other details of the killing, such as the type and size of the freezer into which Burris's body had been placed. Day also stated that the men had been saying that they were "going to rough her up or something," although she did not know that they meant to kill her. When asked why Martin would want to "get" Burris, Day said that it was because Burris had given Martin AIDS.

On April 28, 1999, Arkansas State Police Investigator Scott Pillow drove to St. Louis to pick up Day and bring her back to Arkansas. After booking her into the Lonoke County jail, Pillow informed Day of her *Miranda* rights and began an interview with her, which he audiotaped. During the interview, Day repeated that she joined Martin, Simms, and Perry, and then the group picked up Burris on Main Street in North Little Rock. Day said that Burris was wearing a striped shirt and a pair of shorts at the time. (This fact was later confirmed by Dr. Charles Kokes, the medical examiner, who testified that Burris's remains were clothed in a striped shirt and shorts.) Day essentially repeated to Pillow the same information she had given to Detective Jordan in St. Louis, including the directions to the house where the murder took place, Martin's taking Burris aside to talk to her, and the fact that Martin hogtied Burris with duct tape after placing tape over her mouth and then placed her body in a freezer.

■ On appeal, Martin argues that the State failed to corroborate Day's statements, asserting that once her statement is excluded, there was insufficient evidence to connect him with the murder. His argument is meritless. Ark. Code Ann. § 16-89-111(e)(1) (1987) provides that a person cannot be convicted of a felony based upon the testimony of an accomplice, unless that testimony is "corroborated by other evidence tending to connect the defendant with the commission of the offense." Corroboration is not sufficient if it merely establishes that the offense was committed and the circumstances thereof. *Id.* It must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with the crime and not directed toward corroborating the accomplice's testimony. *Meeks v. State*, 317 Ark. 411, 878 S.W.2d 403 (1994). The test for determining the sufficiency of the

corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *McGehee*, 338 Ark. at 159; *Marta*, 336 Ark. at 73.

■ Circumstantial evidence may be used to support accomplice testimony, but it, too, must be substantial. *Marta*, 336 Ark. at 73 (citing *Peeler v. State*, 326 Ark. 423, 932 S.W.2d 312 (1996)). Corroborating evidence need not, however, be so substantial in and of itself to sustain a conviction. *Flowers v. State*, 342 Ark. 45, 25 S.W.3d 422 (2000). Where circumstantial evidence is used to support accomplice testimony, all facts of evidence can be considered to constitute a chain sufficient to present a question for resolution by the jury as to the adequacy of the corroboration, and the court will not look to see whether every other reasonable hypothesis but that of guilt has been excluded. *Johnson v. State*, 303 Ark. 12, 792 S.W.2d 863 (1990).

After excluding Day's statements, the evidence introduced at trial showed the following. Burris and Martin had been dating for several months before she disappeared. Burris was a prostitute who traded sex for drugs, and sometime in 1996, she contracted HIV. On July 3, 1998, a "sincerely upset" and "very emotional" Martin informed his parole officer, William Lambert, that he had found out that his girlfriend had given him the AIDS virus.

Late in July of 1998, Gloria Green, who lived in North Little Rock, saw Burris and Martin walking past her house. While she saw the two of them walk past her house nearly every day, on this day, Martin "snatched on" Burris and pulled her into an alley. When the two came out of the alley, Martin forced the screaming Burris into an older model car and drove down Eighteenth Street in North Little Rock. That was the last time Green saw Burris.

Also in late July 1998, Harold Tunious, the manager of a convenience store at Eighteenth and Main in North Little Rock, saw Burris in his store the day before she was reported missing. The next day, Tunious said that Martin came into the store and asked if anyone had seen Burris; Martin also made a statement to the effect that he felt something bad had happened to her, and that she was missing. Tunious thought it strange at the time for Martin to think anything bad had happened, because it was not uncommon for Burris not to show up for a while. A few months later, Martin came back to Tunious's store and removed a missing-person flier he had

put up, saying that Burris had been found. Tunious also said that Martin had told him a story about seeing Burris forced into a vehicle, and that he thought she might be dead. Clara Govig, a friend of Burris's, testified that before Burris disappeared, Martin wore his hair in long braids, but after her disappearance, he cut his hair short and moved out of his residence. Martin's brother, Miles Hunter, also testified that Martin told him Burris was missing on the day after she disappeared, and Hunter further confirmed that two days after Burris's disappearance, Martin moved out of the house where he had lived with Burris.

Lalla Lindsey, Burris's grandmother, testified that Martin called her on July 21, 1998, the day after Burris disappeared, saying that Burris was missing and that he thought she might be dead. Martin told Lindsey that Burris had gone out about one o'clock in the morning and "gotten in a car," but that he had not seen her since. Lindsey stated that Martin called her "quite a bit," and that he told Lindsey several stories about where Burris might be. On one occasion he told Lindsey he had seen Burris walking with a Mexican man in Levy; another time, he stated that while he was looking for Burris in Levy, he walked past an abandoned house that had a bad smell coming from it. Later, he suggested Burris might be in Lonoke, visiting her mother.

Dr. Charles Kokes, the associate medical examiner, testified that Burris died of suffocation due to an external obstruction of the airway. She had been "hog-tied," with her hands and feet bound behind her back by duct tape and a telephone wire. Kokes described that a gag of duct tape was wrapped around the front of Burris's face, covering her eyes, nose, and mouth, and extending down over the top of her neck, and that her body had then been put into a chest-type freezer. Dr. Kokes said that Burris's right elbow had been broken, and he opined that she had suffocated because of the gag over her face; he stated, however, that due to the state of decomposition, he could not rule out the possibility that some other form of trauma had contributed to her death. A chair that was also recovered from the crime scene was found to have hairs on it; later examination by the Arkansas State Crime Lab showed that those hairs were microscopically similar to Yolonda Day's hair.

 The foregoing evidence clearly established Burris's murder and tended to connect Martin to its commission. He gave inconsistent stories about Burris's disappearance, and made conflicting suggestions about her whereabouts. Moreover, he both

moved and changed his appearance within a few days of her disappearance. The jury is not required to lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of incriminating conduct. *Branscum v. State*, 345 Ark. 21, 43 S.W.3d 148 (2001); *Chapman v. State*, 343 Ark. 643, 38 S.W.3d 305 (2001). Further, this court has held that false and improbable statements may be considered as evidence of guilt. *Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690 (2000). Gloria Green's testimony linked Martin with Burris's disappearance, and the jury could also have considered Martin's inconsistent and conflicting statements and behavior as evidence of guilt. Viewing the evidence in the light most favorable to the State, as we are required to do, *see Branscum, supra*, we conclude that the evidence was sufficient to corroborate Day's statement and to support the jury's finding of guilt.

For his second point, Martin argues that the trial court erred in admitting the audiotaped and videotaped statements Yolonda Day gave to police. The court admitted the statements under the residual hearsay exception, Ark. R. Evid. 803(24). Martin contends this decision was error because the statements did not possess the requisite circumstantial guarantees of trustworthiness required by the rule. Martin also asserts that the trial court erred because the use of this evidence violated his due process and confrontation clause rights.

Prior to trial, the State moved to introduce Day's two statements under Ark. R. Evid. 803(24). That rule provides that certain statements are not excluded by the hearsay rule as follows:

(24) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (i) the statement is offered as evidence of a material fact; (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

At a pretrial hearing on the admissibility of Day's statements, the trial court noted that it had seen the videotape, and found that the statement had the requisite circumstantial guarantees of trustworthiness. The court also pointed out that Martin's confrontation clause arguments were obviated because Day was available for cross-examination. The court then questioned Day about her statements; Day asserted that her intent was to claim that she had lied when she gave those statements. Ultimately, the court ruled that the statements would be admissible under Rule 803(24). At trial, defense counsel extensively cross-examined Day about her statements; Day continued to maintain that she lied to the police, although she conceded that she was never threatened by officers, and simply made up the statements because she was tired and did not think the police would believe her.

█ The residual hearsay exception was intended to be used very rarely, and only in exceptional circumstances. *Barnes v. Barnes*, 311 Ark. 287, 843 S.W.2d 835 (1992). If a statement is to be admitted under the exception, it must have circumstantial guarantees of trustworthiness equivalent to those supporting the common-law exceptions. *Id.*; *Blaylock v. Strecker*, 291 Ark. 340, 724 S.W.2d 470 (1987). In determining that trustworthiness, the trial court must, under the language of the rule, determine that (1) the statement is offered as evidence of a material fact, (2) the statement is more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts, and (3) the general purposes of these rules and the interests of justice will best be served by admission of the statements into evidence. *Blaylock*, 291 Ark. at 350.

█ A trial court has substantial latitude under Rule 803(24) to admit evidence which it feels meets the spirit of the rule. *Hess v. Treece*, 286 Ark. 434, 693 S.W.2d 792 (1985). Further, this court has repeatedly recognized that matters pertaining to the admissibility of evidence are left to the sound discretion of the trial court. *See, e.g., Harmon v. State*, 340 Ark. 18, 8 S.W.3d 472 (2000). We will not reverse a trial court's ruling on a hearsay question unless the appellant can demonstrate an abuse of discretion. *Sera v. State*, 341 Ark. 415, 17 S.W.3d 61 (2000); *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997)).

Here, after reviewing the videotaped statement, the trial court found that Day's statements had circumstantial guarantees of trustworthiness, and further found the factors in Rule 803(24) to be in place. First, the statements were offered as evidence of the material

fact that Martin killed Burris, as well as the manner in which he committed the murder. Second, the trial court found that the statements were more probative on the point for which they were offered than any other evidence the proponent could procure through reasonable efforts. While the State was able to offer the testimony of numerous witnesses who described seeing Martin with Burris, and spoke of Martin's unusual behavior following her disappearance, Day was the only witness who set out the details and the actual circumstances of the murder. These details — such as the detailed directions to the abandoned house, the fact that Burris's face and mouth had been duct-taped, and the fact that her arms and legs were hogtied — were highly indicative of the truthfulness of Day's statements,[1] and thus rendered the statement more probative of the fact that Martin killed Burris than any other evidence which the State was able to introduce. Finally, the trial court found that the purpose of the rules of evidence and the interests of justice would be served by the introduction of the statements.

██ Rule 102 of the Arkansas Rules of Evidence provides that the purpose of the rules is to "secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence, to the end that the truth may be ascertained and proceedings justly determined." By permitting the State to introduce this testimony, the trial court found that the statement was necessary to the administration of justice, in that Day was an eyewitness to the murder. Day had also asserted to the court that she would continue to maintain that her earlier statements were lies, and the court's ruling was thus an appropriate means to ascertain the truth. Further, the court conducted an extensive hearing on the admissibility of this evidence, and noted that Martin had the opportunity to cross-examine Day during the hearing, and would have another chance to do so during the trial. Thus, the trial court's ruling on this issue cannot be said to have been an abuse of discretion.

██ Martin also argues that his confrontation clause rights were violated by the introduction of these statements, citing *White v. Illinois*, 502 U.S. 346 (1992), and *Lilly v. Virginia*, 527 U.S. 116 (1999), in support of this argument.[2] The Confrontation Clause of

---

[1] Day's presence at the house where the murder was committed was corroborated by criminalist Chantelle Bequette's testimony that a hair matching Day's was recovered from a chair seized from the crime scene.

[2] While *Lilly* does speak strongly of the inherent unreliability of statements against penal interest, made by a declarant against a defendant, that holding was premised on a

the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, mandates that a declarant's out-of-court statement, when repeated by someone other than the declarant and offered to prove the truth of the matter asserted, may be admitted into evidence only if it bears "adequate indicia of reliability." *Vann v. State*, 309 Ark. 303, 831 S.W.2d 126 (1992). To fall within the admissible category, the evidence must show that the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, although courts have recognized that there is no "mechanical test for determining 'particularized guarantees of trustworthiness' under the Clause." *Vann*, 309 Ark. at 307 (quoting *Idaho v. Wright*, 497 U.S. 805 (1990)).

■ Here, the statements given by Day were consistent, uncoerced, and contained details that would not have been known by a person who was not present at the scene. These factors, considered by the trial court as indicative of the reliability of Day's statement, rendered the statements reliable. Further, Martin had ample opportunity to cross-examine Day about her statements, and he did so both at the pretrial hearings and at the trial itself. Accordingly, we hold that the trial court's decision to admit Day's statements under the residual hearsay exception was not error.

The record in this case has been reviewed for other reversible error in accordance with Ark. Sup. Ct. R. 4-3(h), and none has been found. For the aforementioned reasons, the judgment of conviction is affirmed.

---

situation in which the defendant was unable to cross-examine the declarant. That is not the situation here.