Wallace A. GARDNER  *v.*  STATE of Arkansas

CR 05-472                                    221 S.W.3d 339

Supreme Court of Arkansas
Opinion delivered January 5, 2006

[Rehearing denied February 9, 2006.]

Cullen & Co., PLLC, by: *Tim Cullen*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

JIM GUNTER, Justice. This appeal arises from the conviction and sentence of appellant, Wallace Gardner, by a Pulaski County jury for the shooting death of Glen Ford, Jr. Appellant was convicted of capital murder, a violation of Ark. Code Ann. § 5-10-101 (Repl. 1997), a class Y felony, and aggravated robbery, a violation of Ark. Code Ann. § 5-12-103 (Repl. 1997), a class Y felony. Appellant was sentenced as a habitual offender to life imprisonment without parole on the murder conviction and twenty-seven years for the aggravated-robbery conviction. On appeal, he argues that the circuit court erred in denying his motion for directed verdict. We affirm.

On January 5, 2004, appellant and two other men approached the door of an apartment occupied by the victim and Joseph Kendall. Kendall allowed the men to come inside, and appellant asked the victim if he had any dope to sell. The victim replied that he did not have any dope and escorted them out of the apartment. According to accomplice testimony, the victim "rushed" appellant, and appellant and the victim got into a physical altercation. Gunshots were fired, and the group fled the scene in a silver Impala. According to accomplice testimony, appellant admitted that he shot the victim in the chest. The victim suffered a gunshot wound and died from loss of blood and a collapsed lung.

On March 10, 2004, the State charged appellant by felony information with capital murder, aggravated robbery, possession of a firearm, and possession of a firearm by a felon. Appellant was tried on September 28 and 29, 2004. At trial, the following testimony was presented. Appellant's accomplice, DeAngelo Smith, testified that he received a telephone call from his cousin, Fate McMiller, and Smith went to McMiller's house. Appellant, McMiller's brother, and his girlfriend, Kia, drove to McMiller's house in a silver Impala. Appellant drove McMiller and Smith to several apartment complexes, dropped off Kia, and picked up Wayne Derrick, who said that he needed $400.00. The group then

drove to a trailer where one man gave Derrick some bullets. After that, the group went to the victim's apartment looking for "a white guy and a black guy." Appellant passed a gun to McMiller, and they discussed how to use the gun. According to Smith, the purpose of going to the victim's apartment was to "get the dope and the money."

Smith testified that, once inside the apartment, appellant and the victim were arguing, and the victim insisted that he had no more dope. At trial, the following colloquy occurred during Smith's testimony:

Q: Do you know what was being said by Wallace Gardner [appellant] and the other guy?

A: No, ma'am. The only thing I heard was the black — the black male [the victim] saying that he — he doesn't have anymore — anymore dope.

Q: What happened after that?

A: After that, that's when I turned around and Wallace was walking to the door. So we were about to leave and the white — and the black male was walking behind us. And so I was behind the black male. I was behind him. And Wallace opened the door, and when he opened the door, the black guy was like close to him and I was like behind them, like walking out the door, and he [appellant] turned around.

. . .

Q: What happened next?

A: When he turned around, the black guy — black guy rushed him, and the black guy ran toward him in a — in a forceful way. And they were starting to go out the door, and I heard a shot. I heard a gunshot.

Q: What happened after you heard the gunshot?

A: After I heard the gunshot, I started to go out the door, and I looked to my left and I see the white male with a gun in his hand.

Q: Okay. Then what happened?

A: And then after that, I ran out the door. And when I ran out the door, I started running towards the car. And when I got to the car, the car was — well, it wasn't parked. It was like — like out of the parking spot and like fixing to go down the road — down the roadway. And when I looked back over — well, when I made it to the car, the doors were locked. And when I looked over the car, I seen Wallace and the other individual were tussling.

. . .

Q: When you say both of them, are you talking about Wallace Gardner and the guy that was in the apartment?

A: Yes, ma'am.

. . .

Q: Did anybody talk about what happened?

A: After — after we entered the car?

Q: After you got in the car.

A: When we got in the car, he — Wallace was — the guy — the guy asked, you know, what happened. And Wallace was like I shot him right here. And he said I shot him right here, and it was like pointing in the upper — upper part of the chest.

On cross-examination, Smith admitted that he lied to police officers during their investigation.

Lakea Warren, appellant's former girlfriend, testified that she and appellant were together on the evening of January 4, 2004, and that appellant was driving her 2000 silver Impala. Appellant dropped her off, and she found appellant and her car the next morning.

Edward Henderson, who lives in a trailer in McAlmont, testified that appellant and other men came to his trailer on the night of January 4 or January 5, and they left with some ammunition. Chris Perry, who lived at the same apartment complex as the victim, testified that on the night of January 5, 2004, he heard gunshots and noticed a silver vehicle driving "erratically" with "a male running on the side of it." Additionally, Linda Williams, who lived next door, testified that she heard gunshots outside her apartment, and a bullet passed through her apartment and lodged in a wall.

Pivotal testimony came from Joseph Kendall, who was with the victim at his apartment on the night of the murder. Kendall recognized appellant as one of the men who came to the victim's apartment. Kendall testified that, between 11:30 p.m. and 12 a.m., the three men came into the apartment and wanted to know if they had any dope. According to Kendall, the victim would have sold dope to appellant, but he did not know him. Appellant "had a funny look on his face" and "was the only one that said anything." The following colloquy occurred at trial:

Q: What did he [appellant] say to you?

A: He just — well, like do y'all got some dope? He was like I know y'all got some. He just kept really pushing the issue on it.

. . .

Q: Okay. So y'all said you didn't have any dope to sell?

A: Right.

Q: And what happened then?

A: Well, he was like all right we're fixing to go. So the other two dudes, they left out first.

Q: All right.

A: And he [appellant] left out last. And he asked one more time like man y'all sure y'all ain't got nothing? I was like no, we ain't got nothing. So Glen was like closing the door, and I was looking out the window trying to see what kind of car or whatever they was in because we live in a — it's like a dead end where our apartment is, and I didn't see no car outside. And when he was closing the door, I heard Glen say hold on .... And then the door swung open and then I heard — I heard two shots.

Q: What, the door was kind of like knocked open?

A: Right.

Q: And who was — who was he walking out the door — who was the person he was next to when he was walking out the door?

A: Well, he wasn't really next to him. He was kind of like right behind him.

Q: Who was he right behind?

A: He was the last one to leave.

Q: This guy [appellant] was?

A: Right.

Kendall testified that he hid cocaine and a gun that was on the victim's person before calling 911. It was later determined that the victim had 8 grams of cocaine on his person.

Kendall further testified that he identified appellant, a local rapper, from a CD cover while at a friend's house. Kendall stated, "So as soon as he [friend] brought me the cover, I looked at the picture. I was like this is the dude right here. It just — you know, it just all came to me right then." Detective Mike Blain, an investigator who was assigned to investigate the victim's death, testified that Kendall identified appellant in a photo spread.

Dr. Charles Kokes, chief medical examiner at the Arkansas State Crime Laboratory, testified that the cause of death was the gunshot wound. He testified that the victim had cocaine in his system. A tube of Chapstick and $126.85 were present on the victim's person.

The jury convicted appellant of capital murder and aggravated robbery, and sentenced him to life imprisonment without parole and a consecutive term of 324 months. From this conviction and sentence, appellant brings his appeal.

Appellant's sole point on appeal is that the circuit court erred in denying appellant's motion for directed verdict on the capital-murder charge. Specifically, appellant challenges the sufficiency of the evidence on the basis that there was insufficient corroboration of accomplice testimony. Appellant further asserts that the State's corroborating evidence is insufficient to sustain the burden of proof for the underlying felony of aggravated robbery.

In response, the State argues that it is not required to prove each element of the offense independently of the accomplice's testimony. The State further asserts that appellant's claims should

be rejected because the evidence demonstrated that the underlying felony of aggravated robbery was attempted and that appellant was connected to the crime.

It is well settled that we treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Jones v. State*, 357 Ark. 545, 182 S.W.3d 485 (2004). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.* On appeal, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *Id.* The requirement that a defendant make a specific directed-verdict motion extends to any challenge to the sufficiency of the evidence corroborating an accomplice's testimony, and the failure to challenge the sufficiency of accomplice-corroboration evidence in a directed-verdict motion at trial precludes appellate review on that ground. *Tillman v. State*, 364 Ark. 143, 217 S.W.3d 773 (2005).

Appellant does not challenge the sufficiency of the evidence supporting the act of the murder itself, but rather, his argument focuses on the State's proof offered in support of the underlying felony of aggravated robbery. Appellant was convicted of capital-felony murder with aggravated robbery as the underlying felony, pursuant to Ark. Code Ann. § 5-10-101(a)(1), which provides in pertinent part:

> (a) A person commits capital murder if:
>
> (1) Acting alone or with one (1) or more other persons, he or she commits or attempts to commit ... robbery ..., and in the course of and in furtherance of the felony or in immediate flight therefrom, he or she or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life[.]

*Id.* Under the capital-felony-murder statute, the State must first prove the felony, so the felony becomes an element of the murder charge. *Woods v. State*, 363 Ark. 272, 213 S.W.3d 627 (2005).

A person commits the offense of aggravated robbery "if he commits robbery as defined in § 5-12-102, and he (1) [i]s armed with a deadly weapon or represents by word or conduct that he is

so armed; or (2) [i]nflicts or attempts to inflict death or serious physical injury upon another person." Ark. Code Ann. § 5-12-103 (Repl. 1997). A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately thereafter, he employs or threatens to immediately employ physical force upon another. Ark. Code Ann. § 5-12-102 (Repl. 1997).

The accomplice-corroboration statute, found at Ark. Code Ann. § 16-89-111(e)(1) (2003), provides:

> (e)(1) A conviction cannot be had in any case of felony upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof.
>
> (2) However, in misdemeanor cases, a conviction may be had upon the testimony of an accomplice.

*Id.*

Corroboration is not sufficient if it merely establishes that the offense was committed and the circumstances thereof. *Martin v. State,* 346 Ark. 198, 57 S.W.3d 136 (2001). It must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with a crime and not directed toward corroborating the accomplice's testimony. *Id.* The corroborating evidence need not be sufficient standing alone to sustain the conviction, but it must, independent from that of the accomplice, tend to a substantial degree to connect the accused with the commission of the crime. *Rhodes v. State,* 276 Ark. 203, 634 S.W.2d 107 (1982). The test is whether, if the testimony of the accomplice were completely eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Marta v. State,* 336 Ark. 67, 983 S.W.2d 924 (1999). The corroborating evidence may be circumstantial so long as it is substantial; evidence that merely raises a suspicion of guilt is insufficient to corroborate an accomplice's testimony. *Gordon v. State,* 326 Ark. 90, 931 S.W.2d 91 (1996).

With this well-established precedent in mind, we turn to the present case. Appellant's attorney made the following motion for directed verdict at the close of the State's case-in-chief, where the following colloquy occurred:

DEFENSE COUNSEL: Your Honor, at this time I would move for a directed verdict. I feel like the State has not met its burden of proof regarding the capital murder. They have not shown it was Wallace Gardner, first of all. I think there's been several different — the Joe Kendall gave several different descriptions about the person and said several different times that he didn't know the person, never saw their face, many different things that caused him to question the identity. Also, I would add that there's no showing that this was committed in the course or in furtherance of an aggravated robbery. There's been no showing of anything taken, no money, no drugs taken. There's been — Joe Kendall said that he never saw anybody with a gun, there was never anything going on that indicated a robbery. And in DeAngelo Smith's first sworn statement, he said that it was no robbery. I think the State's not met its burden of proof with regard to that, and that would be my same argument for the aggravated robbery count. Also, to simply say that as far as there's also not been sufficient corroboration of — of DeAngelo Smith's statement regarding this incident.

THE COURT: Okay. In viewing the light most favorable to the State and in viewing the evidence and the testimony in the light most favorable to the State, which I believe is my standard at this point in time during the trial, I'll deny the defense's motions for directed verdict ... [.]

██ Here, there is sufficient evidence to support appellant's conviction of the underlying felony, aggravated robbery, after eliminating the accomplice testimony of DeAngelo Smith. Other corroborating evidence presented at trial demonstrates that appellant (1) had the purpose of committing theft with the use of physical force, (2) was armed with a deadly weapon, and (3) caused the death of the victim. *See* Ark. Code Ann. §§ 5-12-102 through 103. First, appellant had the purpose of committing a theft with the use of physical force. Appellant and three other individuals went to Henderson's house with the purpose of acquiring ammunition for their firearm. One individual remained in a getaway car while appellant, Smith, and McMiller went to the victim's apartment. Kendall, the victim's friend and a witness at the scene, provided crucial testimony that he did not know appellant, but appellant and

"two other dudes" showed up unexpectedly at the victim's apartment and repeatedly asked "a dozen" times if Kendall and the victim had any dope. According to Kendall, appellant insisted, "I know y'all got some." Kendall testified that appellant and the others did not follow the victim's typical procedure for a drug transaction. He stated, "[N]obody had called or nothing. Because we usually work off of the phone or whatever." Kendall further testified that the victim did not want to sell any dope to appellant, who had a "funny look on his face." While the group was present in the victim's apartment, appellant was the only one who did the talking. This fact demonstrates that the group was not present for a social visit, but rather they went to the apartment, armed, to steal drugs from the victim. Kendall further stated that the other two men left first. As the victim shut the door, Kendall heard the victim say, "[H]old on," to appellant before he heard two gunshots. Thus, based upon these circumstances, we conclude that appellant had the purpose of committing theft with the use of physical force.

██ The second element of appellant's possession of a deadly firearm is satisfied. *See* Ark. Code Ann. § 5-12-102. Henderson testified that appellant and three men came to his trailer, where appellant displayed a gun. Henderson provided ammunition for the firearm, and Kendall testified that, although he did not see a handgun on appellant's person, he heard two gunshots fired after the other two men left the victim's apartment after the struggle between appellant and the victim ensued. Additionally, the third element is satisfied. *See* Ark. Code Ann. § 5-12-102. Dr. Kokes testified that the victim died from a gunshot wound. Therefore, the testimony presented at trial, without the use of the accomplice testimony, tends to a substantial degree to connect the accused with the commission of the crime. *See Rhodes, supra.* Based upon our standard of review of viewing the evidence in the light most favorable to the State, we hold that there was substantial evidence to support appellant's capital-murder conviction with the underlying aggravated-robbery felony. Accordingly, we affirm the jury's verdict.

The State asks us to reject the "test of elimination" requirement articulated in *Froman v. State*, 232 Ark. 697, 702, 339 S.W.2d 601, 604 (1960), and its progeny, as the State contends that the requirement "does not comport with the requirement enacted by the legislature." *See* Ark. Code Ann. § 16-89-111(e)(1). However, based upon our holding in this case, we see no need to disrupt our

long-standing case law on this issue by eliminating the requirement. There is sufficient evidence to support appellant's conviction after eliminating the accomplice testimony of DeAngelo Smith and relying upon the testimony of Joseph Kendall, Edward Henderson, and Dr. Kokes.

Pursuant to Ark. Sup. Ct. R. 4-3(h), we have reviewed the record and have determined that there are no errors with respect to rulings on objections or motions prejudicial to the defendant not discussed above. *Swift v. State*, 363 Ark. 496, 215 S.W.3d 619 (2005).

Affirmed.