Bryant M. FLORES *v*. STATE of Arkansas

CR 01–1295 69 S.W.3d 864

Supreme Court of Arkansas
Opinion delivered March 21, 2002

*Daniel D. Becker*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Michael C. Angel*, Ass't Att'y Gen., for appellee.

R OBERT L. BROWN, Justice. Appellant Bryant Flores appealed his conviction of second-degree murder for the murder of Victor Stephens, for which he received a sentence of twelve years, to the Court of Appeals. He raised one issue: the trial court erred in admitting a hearsay statement based on the medical-diagnosis exception to the hearsay rule. The Court of Appeals agreed with Flores and reversed the judgment of conviction and remanded for a new trial. *See Flores v. State*, 75 Ark. App. 397, 58 S.W.3d 417 (2001). The State petitioned this court

for review, and we granted the same. We reverse the judgment of conviction and remand for a new trial.

In March of 2000, Flores was living with his girlfriend, Karen Stephens, in Hot Springs. The couple had been living together for about a year, and two children lived with them. One child was Victor Stephens, Karen Stephens's child from a previous relationship, who at the time was three years old. The other child was Gohan Flores, Karen Stephens's and Flores's child, who was four months old at the time of the events giving rise to this appeal. During the time they were living together in Hot Springs, Flores was employed intermittently. Karen Stephens was unemployed during the entire period of time. In the early afternoon of March 26, 2000, Karen Stephens placed a 911 call requesting ambulance service to their residence. She placed the call from a pay phone at the convenience store across the street from where she and Flores lived. Paramedics were dispatched to the residence at 1:41 p.m. and arrived about six minutes later. Karen Stephens was standing in the front yard holding Victor. The paramedics found Victor to be unresponsive to pain and to their verbal inquiries, and his respiratory rate was severely depressed. The paramedics began treating Victor immediately. They noted bruises and abrasions all over the child's body. They also noted his dilated and unresponsive pupils and a tightly clenched jaw, which indicated that he had suffered a severe head injury.

During this initial treatment, the paramedics questioned Karen Stephens about Victor's medical history. She answered most of the questions by saying "I don't know." She also told them that Victor did not have a doctor and that he had never been to one. She added that she did not know if the child was taking any medication or had had any medical problems in the past. Hill testified that she seemed calmer than most parents in similar situations and that her responses seemed "inappropriate." Flores emerged from the residence briefly during the on-the-scene treatment, and he too appeared calm to Hill. He did not talk with the paramedics or go to the hospital with Karen and Victor.

When Victor arrived at St. Joseph's Hospital, he was in a coma. His treating physician was Dr. Karl Wagenhauser. Dr.

Wagenhauser first intubated Victor and then noted his multiple injuries, which were in various stages of healing. Dr. Wagenhauser ordered a CAT scan to determine whether there was hemorrhaging in his brain or abdomen. As Victor was being scanned, Dr. Wagenhauser went to the waiting room to obtain more information from Victor's family and to report the child's status. He found Karen Stephens there and observed that she was calm and was not crying. During this first conversation with Karen, she said that she had been across the street while Victor was "exercising" at their residence. When she returned, she found him unresponsive. She placed Victor in the bathtub and ran water over him to wake him up.

Dr. Wagenhauser testified at trial that the information he gathered during this first encounter with Stephens did not change his treatment or his diagnosis of Victor's condition. At the pretrial *Denno* hearing, he further stated that he did not consider this account from Karen Stephens to have been truthful. He returned to the radiology area to be on-hand in case Victor's situation worsened during his CAT scan. The scan was completed and showed a traumatic brain injury. Specifically, Victor suffered a subdural hematoma — ruptured blood vessels in the brain causing blood clots and swelling. Dr. Wagenhauser decided to have Victor airlifted to Arkansas Children's Hospital in Little Rock for specialized care.

At this point, Dr. Wagenhauser was notified by a social worker that Karen Stephens wanted to speak to him again. At trial, Dr. Wagenhauser testified to the following exchange between Karen Stephens and him:

> PROSECUTOR: Did you later have occasion to speak with her?
>
> DR. WAGENHAUSER: Yes, I did.
>
> PROSECUTOR: And what was the content of that discussion that you had with Karen Stephens?
>
> DR. WAGENHAUSER: I spoke with her just before Victor was airlifted to Little Rock. We let her come into the room to see him before he was sent by helicopter. The social worker was in there with her, or case manager, and had been speaking with her

and Donna called me to the room and said that Victor's mother had something to tell me.

PROSECUTOR: Okay. And did you speak with her at that time?

DR. WAGENHAUSER: Yes, I did.

PROSECUTOR: And what did she communicate to you?

DR. WAGENHAUSER: She told me that both she and the boyfriend had struck Victor and that the boyfriend had thrown Victor up against the wall.

PROSECUTOR: What did you do at that point in time, if anything?

DR. WAGENHAUSER: That did not change my management of Victor at the time. I made a mental note of it.

Garland County Investigator Danny Wilson also spoke with Karen Stephens while Victor was being prepared for the airlift, though Wilson did not testify at trial regarding the content of their conversation. At the pretrial *Denno* hearing, Wilson indicated that Stephens told him that Flores and she had physically abused Victor for the past five months.

During this time period, Flores remained at home with Gohan. While Karen and Victor were at the hospital, Garland County sheriff's deputies and a representative from the Department of Human Services went to Flores's house to remove Gohan. Flores initially thought that the sheriff's deputies had come there to give him a ride to the hospital. The DHS representative, however, took Gohan into custody, and the deputy sheriffs arrested Flores.

After Flores was transported to the Garland County Sheriff's Department, Investigator Wilson questioned him. In the resulting statement, Flores revealed that Victor had urinated on himself and on the bedroom floor. Flores stated he disciplined Victor by making him do jumping jacks. While Victor was doing jumping jacks, Flores left the bedroom. According to his statement, when he returned to the bedroom, he found Victor on the floor unconscious. Flores thought the child was dehydrated, and so he placed him in the bathtub. As for the head injury, Flores's statement was

that he did not know how it occurred, but offered that Victor may have fallen or Flores might have accidentally bumped Victor's head against the bathtub when he placed him in the tub water.

Victor died at Children's Hospital on March 27, 2000. The state charged both Flores and Karen Stephens with capital murder, and later waived the death penalty for Flores. As a result of the pending charges, Karen Stephens invoked her Fifth Amendment right against self-incrimination at all of the Flores proceedings.

On October 4, 2000, the State filed a Motion for Use of Co-Defendant's Statements, in which it sought the admissibility of Karen Stephens's hearsay statement to Dr. Wagenhauser under Arkansas Rule of Evidence 803(4), the medical-treatment exception. Before trial, the trial court held a *Denno* and motion hearing at which Dr. Wagenhauser testified about the circumstances surrounding Karen Stephens's statement. At this hearing, Dr. Wagenhauser testified that it is his practice to speak with the parents of critically injured children to let them know their child's medical status and to gather any information that may be pertinent to the diagnosis or treatment of the child. Dr. Wagenhauser testified that he spoke with Karen Stephen for both of those reasons. He described the first encounter with Stephens — in which she told him that she had been across the street — as unhelpful and not pertinent to Victor's diagnosis or treatment.

At the pretrial hearing, the prosecutor and he engaged in the following colloquy regarding the second encounter:

> DR. WAGENHAUSER: At another time I was called back into the [waiting] room. [Stephens] had been speaking with one of the case managers I know and I spoke with her again there.
>
> PROSECUTOR: Okay, and did she give you any information at that time?
>
> DR. WAGENHAUSER: At that time the case manager told me that the mother had something she wanted to tell me and I asked her what that was and at that time I was physically standing in the room, she was in the room and her son was there on the ventilator, and she told me that both she and the boyfriend had struck him at times and additionally that the boyfriend had thrown the child up against the wall.

PROSECUTOR: Okay, were you able to use what she conveyed to you to help treat Victor?

DR. WAGENHAUSER: I think it basically confirmed a lot of what we'd already seen.

PROSECUTOR: Okay, so did it confirm your diagnosis in essence?

DR. WAGENHAUSER: It helped substantiate it, it did, yes.

PROSECUTOR: And did it make any difference in any further treatment that you gave him, i.e., airlifting him, so forth and so on?

DR. WAGENHAUSER: Did the statement of hers make a difference?

PROSECUTOR: Uh-hum.

DR. WAGENHAUSER: Actually no, it did not. We would have sent him [to Arkansas Children's Hospital] anyway.

This testimony was repeated to a large degree on cross examination at the hearing, and Dr. Wagenhauser repeated that the hearsay statement regarding the abuse and Flores did not assist him in his diagnosis and that all decisions relevant to Victor's treatment had been made by the time she implicated him in the child's injuries.

On redirect examination, the prosecutor engaged Wagenhauser in the following line of questioning:

PROSECUTOR: Okay. After speaking with her were you able to make a diagnosis, though, regarding his condition of what had caused the injuries?

DR. WAGENHAUSER: She — her statement to me did not affect the child's treatment. We had our diagnosis made. What she told me was who caused the injuries at that time.

PROSECUTOR: Okay, so what she told you basically reaffirmed the diagnosis that . . .

DEFENSE COUNSEL: Objection to leading, Your Honor.

THE COURT: Sustained.

DR. WAGENHAUSER: The mother did not diagnose the child. We diagnosed the child.

PROSECUTOR: Correct, I understand.

DR. WAGENHAUSER: We had a CAT scan, we saw the bleed, we saw the injuries. We knew that this child had been beaten. It is not my job to find out who—I don't care who caused the injuries. My job is to take care of the child. I walked into the room, and without me asking, she said that she and her boyfriend had hit the child and that the boyfriend had thrown the child up against a wall. That's what she told me without questioning from myself.

In its posthearing brief, the State argued Rule 803(4) again as well as the excited–utterance exception under Rule 803(2). The trial court granted the State's motion and permitted it to use Karen Stephens's hearsay statement to Dr. Wagenhauser. The trial court said:

The statement made by Karen Stephens to Dr. Karl Wagenhauser . . . is admissible as offered.

The statement provided the treating emergency room doctor with information that was reasonably pertinent to the treatment and diagnosis of the child at that time. Specifically, the statement told the doctor that there was multiple traumas to the child and that the child's body had been thrown against a hard surface.

This statement was provided not to merely identify the perpetrators but to provide the doctor with information as to the cause and extent of the injuries. The doctor testified that this information confirmed his diagnosis.

The case proceeded to a three–day jury trial which resulted in a verdict of guilty for second–degree murder. Flores was sentenced to twelve years in prison. The Court of Appeals reversed his conviction in a unanimous opinion, because that court concluded Karen Stephens's hearsay statement constituted blame shifting and did not fall within the purview of the medical–diagnosis exception. *See Flores v. State,* 75 Ark. App. 397, 58 S.W.3d 417 (2001). The State petitioned for review, and we granted the State's petition.

Flores urges as his sole point on appeal that the trial court erred in allowing Dr. Wagenhauser to tell the jury what Karen

Stephens told him while Victor was being treated at St. Joseph's Hospital. Specifically, he asserts that Karen Stephens's statement that Flores threw Victor against a wall was inadmissible hearsay. The State responds that the statement is admissible under three provisions of the Arkansas Rules of Evidence: (1) under Rule 803(4) as a statement made in furtherance of medical treatment; (2) under Rule 803(2) as an excited utterance; and (3) under Rule 803(24), the residual hearsay exception.

When we grant a petition to review a decision of our court of appeals, we treat the matter as if the appeal had been originally filed in this court. *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001); *Thompson v. State*, 333 Ark. 92, 966 S.W.2d 901 (1998); *Frette v. City of Springdale*, 331 Ark. 103, 959 S.W.2d 734 (1998). The admission or rejection of evidence is within the discretion of the trial court, which this Court will not reverse in the absence of a manifest abuse of that discretion. *Burmingham v. State*, 342 Ark. 95, 27 S.W.2d 351 (2000); *Munson v. State*, 331 Ark. 41, 959 S.W.2d 391 (1998). We have held that a trial court is accorded wide discretion in evidentiary rulings. *Kail v. State*, 341 Ark. 89, 14 S.W.3d 878 (2000); *Skiver v. State*, 336 Ark. 86, 983 S.W.2d 931 (1999). Specifically, we have stated that we will not reverse a trial court's ruling on a hearsay question unless the appellant can demonstrate an abuse of discretion. *Martin v. State*, 346 Ark. 198, 57 S.W.3d 136 (2001); *Sera v. State*, 341 Ark. 415, 17 S.W.3d 61 (2000); *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997).

a. *Medical-diagnosis exception.*

Flores first claims that the trial court erred in ruling that the statement fell within the medical-diagnosis or treatment exception to the hearsay exclusion set out in Rule 803(4). His argument focuses on the fact that her statement identified him as the perpetrator of the fatal blow. As such, it was not related to Dr. Wagenhauser's treatment of Victor's head wound but was, rather, an attempt to shift blame for the child's death to Flores. The State responds that the fact that Victor's abuser was a member of his household made the identification of that abuser relevant to treating his wounds and preventing future abuse.

Rule 803(4) provides in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .

> (4) *Statements for Purposes of Medical Diagnosis or Treatment.* Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Ark. R. Evid. 803(4).

In *Carton v. Missouri Pac. R.R. Co.*, 303 Ark. 568, 798 S.W.2d 674 (1990), this court addressed Rule 803(4) extensively for the first time. In *Carton*, we reversed and remanded the plaintiff's slip-and-fall case for a new trial after the trial court granted a directed verdict in favor of the defendant. Although we reversed on other grounds, we addressed a Rule 803(4) issue due to the likelihood that the issue would recur in the new trial. The disputed point involved a statement made to a treating physician by the plaintiff that she fell and that her fall was caused by the sole of her boot being covered with diesel fuel. We stated for purposes of remand that the statement that she fell was admissible as made in furtherance of treatment under Rule 803(4), but we further stated that the statement regarding the diesel fuel as the reason for her fall was not admissible. We said:

> The basis for this hearsay exception is the patient's strong motivation to be truthful in giving statements for diagnosis and treatment. Cotchett and Elkind, *Federal Courtroom Evidence* 144 (1986). Also admissible under the rule are statements regarding the cause of the condition, *if pertinent to the diagnosis or treatment.* However, where such information is not relevant for diagnosis, but rather attempts to fix blame, it may be excluded. *Id.*, citing federal cases. "Thus a patient's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red light." *Id.* Similarly, plaintiff's statement that her foot slipped and she fell was admissible, but not that she had "apparently accumulated some diesel fuel on her sole." The latter phrase was not pertinent to diagnosis or treatment given by the physician, and, more importantly, the patient had no motivation to be truthful in the

> statement because she knew that it would not matter in her treatment whether she had snow or diesel fuel on her boot. Thus, there is no basis for the hearsay exception.

*Carton*, 303 Ark. at 575, 798 S.W.2d at 677 (emphasis in original).

We applied Rule 803(4) again in *Benson v. Shuler Drilling Co., Inc.*, 316 Ark. 101, 871 S.W.2d 552 (1994). In *Benson*, we considered whether a statement from a person other than the patient seeking treatment was surrounded in the necessary indicia of reliability for purposes of Rule 803(4). There, the doctor had written on his discharge summary that the plaintiff had fallen from a cat walk, but the doctor could not remember whether the plaintiff or someone else had told him that. We held that the statement regarding cause was inadmissible under Rule 803(4), because the doctor was unable to recall who gave him the statement and, thus, a special relationship with the patient could not be established. We quoted from *Weinsteins's Evidence*, p. 803-145 (vol. 4, 1993), as follows:

> Statements relating to someone else's symptoms, pains or sensations would be admissible, provided again, they were made for purposes of diagnosis or treatment. The relationship between the declarant and patient will usually determine admissibility . . . As the relationship becomes less close, the statement becomes less reliable, both because the motive to tell the truth becomes less strong, and because even a stranger in good faith may not be able to describe another's physical pain and suffering as infallibly as an intimate.

*Benson*, 316 Ark. at 109, 871 S.W.2d at 556 (ellipsis in original).

Other courts have considered Rule 803(4) statements in which the victim or someone else not only described the injuries, but also identified the perpetrator. In *United States v. Iron Shell*, 633 F.2d 77 (8th Cir. 1980), the Eighth Circuit Court of Appeals dealt with a case where a doctor testified about a nine-year-old victim's statements to him in an assault-with-intent-to-rape case. The doctor testified that the girl told him that she had been drug into bushes, her clothes had been removed, and the man had tried to force something into her vagina which hurt. There was no statement by the girl to the doctor identifying who

did it. The Eighth Circuit looked to the Federal Rule of Evidence 803(4), which is identical to our Rule 803(4) and applied the hearsay exception. The court said:

> The rationale behind the rule [803(4)] has often been stated. It focuses upon the patient's strong motive to tell the truth because diagnosis or treatment will depend in part on what the patient says.
>
> · · ·
>
> Thus, two independent rationales support the rule and are helpful in its application. A two-part test flows naturally from this dual rationale: first, is the declarant's motive consistent with the purpose of the rule; and second, is it reasonable for the physician to rely on the information in diagnosis or treatment.
>
> · · ·
>
> There is nothing in the content of the statements to suggest that [the victim] was responding to the doctor's questions for any reason other than promoting treatment. It is important to note that the statements concern what happened rather than who assaulted her. The former in most cases is pertinent to diagnosis and treatment while *the latter would seldom, if ever, be sufficiently related.*

*Iron Shell,* 633 F.2d at 83, 84 (emphasis added).

Our court of appeals has also dealt with the issue of a hearsay statement made in the course of medical treatment. *See, e.g., Huls v. State,* 27 Ark. App. 242, 770 S.W.2d 160 (1989). In *Huls,* the court held that a statement by the victim, later murdered, to a dentist that the defendant had broken her teeth by throwing a lamp at her was inadmissible under Rule 803(4). Using the *Iron Shell* analysis which it adopted, the court concluded that the statement was made to identify the perpetrator and not to help the dentist diagnose or treat her. The court, nonetheless, affirmed the defendant's conviction because the defendant did not preserve his hearsay argument for appeal. Likewise, the Kentucky Supreme Court, over hearsay objections, affirmed a man's conviction for sexual abuse of a child where the trial court allowed a physician to testify to a "sanitized version" of the way the injuries were inflicted under that state's Rule 803(4), without mentioning who caused the injuries. *See Garrett v. Commonwealth,* 48 S.W.3d 6

(Ky. 2001); *see also United States v. Nick*, 604 F.2d 1199 (9th Cir. 1979) (per curiam) (affirming conviction where doctor was allowed to testify to statements describing the injury under that state's Rule 803(4), but was required to omit the identity of the assailant).

Only in the special situation of sexual or physical abuse of a child has the rule of excluding the identification of the perpetrator been modified. Again, it is the Eighth Circuit Court of Appeals that has outlined this child-abuse exception in the leading case on the matter. *See United States v. Renville*, 779 F.2d 430 (8th Cir. 1985). In *Renville*, the Eighth Circuit dealt with answers made by a child victim of sexual abuse who was living in a household with the abuser. The questions were asked by the treating physician, who explained to the victim that the questions were being asked to help in her treatment. The child identified her stepfather as the abuser, and the Eighth Circuit held that this statement of identification was admissible due to the fact that it was pertinent to a course of treatment, which was to remove the child from the abuser's home. The Eighth Circuit limited its holding by stating that in order to meet the two-part test set out in *United States v. Iron Shell, supra*, the declarant's statement must be made in response to a question where the identification of the perpetrator is important to diagnosis and treatment, and where the victim manifests an understanding of the importance of the statement given to medical diagnosis and treatment. *Id.* at 438. Shifting blame to another perpetrator was not part of the *Renville* analysis.

Our court of appeals has adopted the *Renville* approach. *See Stallnacker v. State*, 19 Ark. App. 9, 715 S.W.2d 883 (1986). In *Stallnacker*, that court allowed a physician's testimony that a victim had identified her father as her sexual abuser in answer to the physician's questions. The court of appeals has also extended the *Renville* analysis to physical abuse where the victim answered a doctor's inquiry about what happened. *See Clausen v. State*, 50 Ark. App. 149, 901 S.W.2d 35 (1995). The child identified her stepfather as the beater. Again, neither the *Stallnacker* decision nor the *Clausen* decision involved a potentially culpable declarant who identified someone else as the perpetrator.

We conclude that the *Renville* analysis is not pertinent to the case before us. A child victim was not the declarant, and there was no questioning by the doctor which precipitated the hearsay statements. In fact, after the first encounter between Dr. Wagenhauser and Karen Stephens about Victor, the doctor concluded that she was unhelpful and untruthful. Only later did she return and admit to child abuse, while placing the blame squarely on Flores for throwing the child against the wall. Accordingly, there was no inquiry by a doctor pertaining to a future course of treatment, such as removing the child from the home. We further note as a critical distinction that blame-shifting was not an issue in *Renville*, while it is the centerpiece of the case at hand. In holding as we do, we do not intend in any way to diminish the obligation of physicians to report suspected abuse or neglect to the child-abuse hotline. Ark. Code Ann. § 12-12-507 (Supp. 2001). Nor do we intend to undercut the policy behind the *Renville* decision, which is to encourage child victims to identify perpetrators of child abuse for purposes of planning a future course of treatment and placement of the child. We simply conclude that *Renville* does not apply to the facts of this case, where the parent of the child admits to abuse and then shifts the blame for the fatal blow to another.

We are persuaded, however, that the two-part test set out by the Eighth Circuit Court of Appeals in *United States v. Iron Shell*, *supra*, has merit, even though this court is not bound by the decisions of that court. We will proceed in our analysis of the case at hand using the *Iron Shell* standard. The *Iron Shell* analysis requires us to look first at the motive of the declarant and determine whether her motivation was to assist in the diagnosis and treatment of her child. Karen Stephens was the mother of Victor. She was also facing the prospect of prosecution, together with Flores, for the abuse of her child. In the waiting room at St. Joseph's Hospital, she conversed with both a social worker and a law enforcement officer while her child was being treated. She made blame-shifting statements to the social worker *before* she ever made the unsolicited statement to the Dr. Wagenhauser. Because of this, Flores urges that the motive in talking to Dr. Wagenhauser was purely to point the finger at him.

■ At the same time, when talking to the doctor, Karen Stephens admitted to abusing the child herself. We are unwilling to conclude that, as Victor's mother, she was completely without motivation to assist the doctor in her son's treatment by telling him what had occurred. Without question, knowing what caused the injuries to Victor's body as well as the blow to his head would, from the mother's perspective, have been important information for the doctor to have had at his disposal. We hold that the first part of the *Iron Shell* test was met.

■ Under the second part of the test, we examine whether Karen Stephens's statement was relied on by the treating physician. From his own testimony, it is clear that Dr. Wagenhauser had already decided to airlift Victor to Children's Hospital when Karen Stephens told him the cause of Victor's injury. It is also true that he had diagnosed Victor's injuries as being the result of child abuse. Nevertheless, the doctor testified that Karen Stephens's statement *confirmed* his diagnosis. As such, it lent some value to his diagnosis and treatment. We conclude that the second part of *Iron Shell* was also met. Accordingly, Karen Stephens's statement to Wagenhauser *to the extent she told him about the physical abuse to Victor* falls within the medical-treatment exception set out in Rule 803(4).

■ We hold, however, that that part of Karen Stephens's statement that identifies Flores as the culprit in throwing Victor against the wall has no pertinence to his diagnosis and treatment and is inadmissible hearsay. Identifying the perpetrator had nothing to do with medical treatment and could well have been blame-shifting by someone who was soon to be charged as a co-defendant. Other jurisdictions have made this distinction, just as this court did in *Carton v. Missouri Pac. R.R. Co., supra.* See, e.g., *United States v. Iron Shell, supra; United States v. Nick, supra; Nash v. State*, 754 N.E.2d 1021 (Ind. App. 2001) ("Hearsay statements admissible for the purpose of medical diagnosis or treatment typically do not involve statements of identity because identity of the person responsible for the injury is usually not necessary to provide effective medical care."); *Garrett v. Commonwealth, supra.*

b. *Excited-utterance exception.*

 The State's alternative basis for admission of Karen Stephens's statement is the excited-utterance exception to the hearsay exclusion under Rule 803(2). The State urges this court to affirm the trial court because it reached the right result, albeit for the wrong reason, which we clearly can do. *Harris v. State,* 339 Ark. 35, 2 S.W.3d 768 (1999) (citing *Dandridge v. State,* 292 Ark. 40, 727 S.W.2d 851 (1987); *Chisum v. State,* 273 Ark. 1, 616 S.W.2d 728 (1981)). The State further argues that Karen Stephens's statement was made under stress because of the injury to her child and was, thus, an excited utterence. Flores responds in his reply brief that the statement was not made under the stress of the moment, because Stephens's demeanor was, according to all present, unusually calm for a parent of a critically injured child.

Arkansas Rule of Evidence 803(2) provides in relevant part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .
>
> (2) *Excited Utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Ark. R. Ev. 803(2). There are several factors to consider when determining if a statement falls under this exception: the lapse of time, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement. *Fudge v. State,* 341 Ark. 759, 20 S.W.3d 315 (2000); *Moore v. State,* 317 Ark. 630, 882 S.W.2d 667 (1994) (adopting these factors from the Eighth Circuit's decision in *United States v. Iron Shell,* 633 F.2d 77 (8th Cir. 1980)). For the exception to apply, there must be an event which excites the declarant. *Fudge v. State, supra; Moore v. State, supra.* In addition, "[i]n order to find that 803(2) applies, it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." *Fudge v. State, supra* (quoting *Iron Shell,* 633 F.2d at 85–86). The statements must be uttered during

the period of excitement and must express the declarant's reaction to the event. *Fudge v. State, supra; Moore v. State, supra.*

■ Here, in addition to Karen Stephens's calm demeanor, she had time and reason to reflect on her statement to Dr. Wagenhauser and even revise it between her first encounter with him and her second. Her first statement to Dr. Wagenhauser was that she had been across the street and knew nothing about the incident. Her second, revised statement was that Flores threw the child against a wall. These circumstances do not suggest an excited utterance. Nothing about the second statement suggests spontaneity, excitement, or impulsivity. *See Fudge v. State, supra.* Indeed, the content of her statement cuts against the State's argument, because Stephens was shifting the blame for her son's head injury and resulting death to Flores. We hold that the requisite factors for determining an excited utterance are not met.

c. *Residual exception.*

■ For its final argument, the State argues that the statement made to Dr. Wagenhauser falls within the residual hearsay exception, which reads in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .

> (24) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (i) the statement is offered as evidence of a material fact; (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

Ark. R. Ev. 803(24). The residual hearsay exception was intended to be used very rarely, and only in exceptional circum-

stances. *Martin v. State*, 346 Ark. 198, 57 S.W.3d 136 (2001); *Barnes v. Barnes*, 311 Ark. 287, 843 S.W.2d 835 (1992); *Hill v. Brown*, 283 Ark. 185, 672 S.W.2d 330 (1984).

As Flores points out, the requirement of this rule were not met. First, the State failed to give Flores advance notice that Rule 803(24) would be used at trial to admit Karen Stephens's statement. The rule clearly requires this. Indeed, the issue of the residual hearsay exception was never raised to the trial court but was first mounted as an alternative vehicle for admission of her statement on appeal. Nor did the trial court make the necessary findings that the hearsay statement (1) is material, (2) is more probative than other evidence, and (3) serves the interests of justice, as required by the rule. These criteria were all met in *Martin v. State*, *supra*. Here, they were lacking. We decline to admit the statement under Rule 803(24).

We reverse the judgment of conviction and remand for further proceedings. In the event of a new trial, we direct that any reference to Flores as the person who threw Victor against the wall be omitted from Dr. Wagenhauser's testimony. In all other respects, Karen Stephens's hearsay statement to the doctor is admissible.

Reversed and remanded.