J.M. PETERSON, Jr. *v.* STATE of Arkansas

CR 01-993 76 S.W.3d 845

Supreme Court of Arkansas
Opinion delivered June 6, 2002

*William R. Simpson, Jr.*, Public Defender, by: *Clint Miller*, Deputy Public Defender.

*Mark Pryor*, Att'y Gen., by: *Katherine Adams*, Ass't Att'y Gen., for appellee.

RAY THORNTON, Justice. Appellant, J. M. Peterson, was convicted of capital murder and sentenced to life imprisonment without the possibility of parole. This conviction stems from the murder of Lisa Peterson, appellant's ex-wife, on July 4, 1999. This murder occurred while Ms. Peterson was attempting to retrieve clothes from her home, which she was forced to leave because appellant had previously threatened her life.

On January 18, 2001, appellant filed a motion *in limine* seeking to exclude certain testimony. Appellant argued that the testimony should be excluded because it was inadmissible hearsay.

On January 22, 2001, a hearing was held on appellant's motion. At the hearing, Gena Wilfong testified. Ms. Wilfong was Lisa Peterson's workplace supervisor. Ms. Wilfong testified about events that occurred on July 2, 1999. Specifically, Ms. Wilfong stated that Ms. Peterson told her that on July 2, 1999, appellant came to her home at approximately 2:00 a.m., threatened the life of their daughter, bound Ms. Peterson's legs and hands with duct tape, put her into his car, and drove her around for approximately two hours with a gun pointed to her head threatening to kill her. Ms. Peterson relayed these events to Ms. Wilfong shortly after 8:00 a.m.

Appellant argued that Ms. Wilfong's testimony was inadmissible hearsay and that it should be excluded. The trial court denied appellant's motion and allowed Ms. Wilfong's testimony pursuant to Rule 803(2) of the Rules of Evidence based on its findings that the statements made by Ms. Peterson to Ms. Wilfong were admissible pursuant to the "excited utterance" exception to the rule against hearsay.

On January 30, 2001, appellant's jury trial began. At trial, Deshawn Gilmore, Ms. Peterson's nephew, who was present when appellant shot Ms. Peterson, testified about the events surrounding the murder. Mr. Gilmore testified that he heard a gun shot and then saw Ms. Peterson running down the stairs. He further testified that after he heard a second gun shot Ms. Peterson collapsed. After Ms. Peterson collapsed, Mr. Gilmore saw appellant standing over her body with a gun in his hand. Finally, Mr. Gilmore testified that he saw appellant drag Ms. Peterson into the house. Ms. Peterson was then shot six more times in the head.

The jury determined that appellant was guilty of capital murder. On February 16, 2001, the trial court entered the judgment and commitment order sentencing appellant to life without the possibility of parole to be served in the Arkansas Department of Correction.

It is from this conviction that appellant appeals. He does not challenge the sufficiency of the evidence. Appellant raises one point on appeal. We affirm the trial court.

In his only point on appeal, appellant argues that the trial court erred in allowing Gena Wilfong to testify about statements made by Ms. Peterson prior to her murder. Appellant argues that Ms. Wilfong's testimony, which contained events relayed to her by Ms. Peterson, was inadmissible hearsay that the trial court should have excluded.

Pursuant to Rule 801(c) of the Rules of Evidence, "'hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Such testimony is generally inadmissible evidence. See Rule 802 of the Arkansas Rules of Evidence.

In the case now before us, appellant objected to Ms. Wilfong testifying as to statements made to her by Ms. Peterson. These statements concerned events that occurred on July 2, 1999. Specifically, the testimony described appellant allegedly committing battery against Ms. Peterson and kidnapping Ms. Peterson. The trial court denied appellant's motion to exclude the testimony. On appeal, the State argues that Ms. Wilfong's testimony was admissible pursuant to Rule 803(2) of the Rules of Evidence. This rule provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> (2) *Excited Utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

*Id.*

There are several factors to consider when determining if a statement falls under this exception: (1) the lapse of time, (2) the age of the declarant, (3) the physical and mental condition of the declarant, (4) the characteristics of the event, and (5) the subject matter of the statement. *Flores v. State*, 348 Ark. 28, 69 S.W.3d 864 (2002); *see also Fudge v. State*, 341 Ark. 759, 20 S.W.3d 315 (2000); *Moore v. State*, 317 Ark. 630, 882 S.W.2d 667 (1994) (adopting these factors from the Eighth Circuit's decision in *United States v. Iron Shell*, 633 F.2d 77 (8th Cir.1980)). We have noted that the lapse of time between the startling event and the out-of-court statement, although relevant, is not dispositive of the application of the excited utterance exception to the hearsay rule. *Killcrease v. State*, 310 Ark. 392, 836 S.W.2d 380 (1992).

For the exception to apply, there must be an event which excites the declarant. *Fudge, supra.* Additionally, "to find that 803(2) applies, it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." *Fudge, supra* (quoting *Iron Shell, supra*). The general rule is that an utterance following an exciting event must be made soon enough

thereafter that it can reasonably be considered a product of the stress of the excitement rather than of intervening reflection or deliberation. *Fudge, supra.* However, we have noted that the trend is toward expansion of the time interval after an exciting event. *Id.* We have also noted that continuing emotional or physical shock and loss of consciousness, unabated fright, isolation and other factors may also prolong the time, making it proper to resort to Rule 803(2), despite long lapses of time. *Cole v. State*, 307 Ark. 41, 818 S.W.2d 573 (1991).

■ The statements must be uttered during the period of excitement and must express the declarant's reaction to the event. *Fudge, supra.* It is within the trial court's discretion to determine whether a statement was made under the stress of excitement or after the declarant has calmed down and had an opportunity to reflect. *Id.*

■ Remaining mindful of the applicable legal principles, we now consider whether the trial court properly admitted Gena Wilfong's testimony. A trial court is accorded wide discretion in evidentiary rulings. *Flores, supra.* We will not reverse a trial court's ruling on a hearsay question unless the appellant can demonstrate an abuse of discretion. *Id.* Ms. Wilfong's testimony in pertinent part was as follows:

> Q: [THE ATTORNEY FOR THE STATE] Did you know the young lady by the name of Lisa Peterson?
>
> A: [GENA WILFONG] Yes, I did.
>
> * * *
>
> Q: Okay, I want to draw your attention to Friday, July the 2nd —
>
> A: Uh-huh.
>
> Q: — of 1999. Do you remember on that day getting a phone call from her?
>
> A: Yes, I do.
>
> Q: And what — at what time of day was that?
>
> A: It was about — we open at eight, and it was about ten till eight.

\* \* \*

Q: When you picked up the phone, how did she sound?

A: She was crying, very distraught, very upset. She indicated that something had happened —

\* \* \*

Q: You said that Ms. Peterson was — sounded upset and was crying.

A: She was very distraught. She was crying, said that something had happened that she needed to talk to me about.

Q: Had you ever seen her — had you ever seen her like that before?

A: No.

Q: Or heard her like that?

A: No. Lisa was always a very calm person.

Q: Okay. Did y'all agree on a meeting place or —

A: Well, she was on her way to work, and she wanted — I can't remember if she asked me to come downstairs and meet her in the parking lot, or if I knew that by — by the sound of her voice that I needed to be there.

\* \* \*

Q: Okay. So what did y'all do?

A: We went inside the building. She was — Lisa was very concerned that she did not want her coworkers to see her in that condition, meaning that it was very obvious that she had been crying.

\* \* \*

Q: Okay. Was she still upset when you were talking to her upstairs?

A: Yes, She came into my office and we closed the doors, and I had a box of Kleenex there waiting to hear what she was going to tell me.

Q: And what did she tell you, Ms. Wilfong?

A: She indicated that around two o'clock that morning, that Friday morning, that her ex-husband came over to the house and that he had taken out some — I thought she said duct tape, but somehow he had a gun that he pulled out and that he threatened her and indicated that if she made any noise that he would go into the bedroom where their daughter was sleeping and would kill her.

Q: And so what did she allow him to do with the tape?

A: She indicated that he bound her up and carried her out of the house into a car, and left the daughter sleeping in the house.

Q: Did she know where he took her?

A: She indicated that they drove somewhere into the woods. She said it was a wooded area. She said she had no idea where it was. I can't remember if she was blindfolded or if she was just down in the car, but she didn't — she didn't know where she was.

\* \* \*

Q: He taped her and then took her. And did she say she knew where?

A: She didn't know where. She indicated that for approximately two hours, that he pointed a gun to her head, to her heart and repeatedly told her he was going to kill her.

Q: Okay. How did she get back home? Did she tell you that?

A: She said — and she was still in shock at the time. She — she indicated that she knew at the time he was going to kill her, and she thought, if he kills me here, no one will ever find me. She said somehow — and she didn't — still couldn't believe that she was able to talk him out of it.

But apparently, they — he brought her back to her house, and Lisa indicated that she was covered in mud from head to toe, and that she went in and took a shower, and I believe she said Mr. Peterson [appellant] fell asleep.

Q: Okay. And then after Mr. Peterson, the defendant, fell asleep, what was she able to do?

A: She said that after she got out of the shower, that she dressed quickly and got Ebony [Ms. Peterson's daughter] out of bed and left the house.

Q: Okay. And then she came to where you were?

A: I believe so.

\* \* \*

Q: Okay. Ms. Wilfong, how did she look physically other than being upset and crying? Did she have any injuries?

A: Besides her face being swollen from the tears, she showed me on her arm and on her leg — legs numerous scratches, and she also had some type of cut on her lip.

After reviewing Ms. Wilfong's testimony, we conclude that the trial court properly admitted the statements made by Ms. Peterson to Ms. Wilfong as an excited utterance. Ms. Peterson made these statements to Ms. Wilfong after she endured a night filled with terror. The violence which Ms. Peterson experienced in the early morning hours of July 2, 1999, was clearly an "excited or startling event." At approximately 2:00 a.m., Ms. Peterson: (1) had her hands and legs bound with duct tape by appellant; (2) was kidnapped by appellant, and removed from her home leaving her daughter at home alone; (3) had a gun held to her head for an extended period of time by appellant; and (4) had her life threatened by appellant.

After two hours of abuse and threats, appellant returned Ms. Peterson to her home. Although appellant returned Ms. Peterson to her home, he did not leave. Appellant's presence in Ms. Peterson's home after committing battery against her and after kidnapping her prolonged the "startling event." Because appellant remained in Ms. Peterson's home, she was forced to wait until he fell asleep before she was able to escape from her own home with her daughter. This further prolonged the "startling event."

It was after this escape, at approximately 7:50 a.m., that Ms. Peterson informed Ms. Wilfong of the violence she had experienced. Ms. Wilfong's testimony demonstrates that Ms. Peterson's statements were made while she was still under the stress of excitement from the startling event. Ms. Wilfong testified that when Ms. Peterson arrived at her office she was "crying," "very distraught," and "very upset." Ms. Wilfong further testified that while Ms. Peterson was describing the events of July 2, 1999, she

also showed signs of physical injury on her face, legs, and arms. Finally, Ms. Wilfong testified that on the morning of July 2, 1999, when Ms. Peterson was describing the battery and kidnapping, she was acting in an unusual manner. Ms. Wilfong stated that she had never seen Ms. Peterson behave in such a manner because she usually was "a calm person."

The case *sub judice* is factually similar to *Fudge v. State, supra.* In that case, Mr. Fudge was convicted of the capital murder of his wife, Kimberly Fudge. On appeal, he argued that the trial court had improperly admitted hearsay evidence. *Id.* The evidence, which Mr. Fudge challenged, was the testimony of two witnesses. These witnesses testified that Mrs. Fudge informed them that Mr. Fudge had beaten her, choked her, and forced her to have sex. *Id.* Mrs. Fudge made these statements to the witnesses "anywhere from one to several hours" after the events occurred. *Id.* One of the witnesses testified that Mrs. Fudge appeared nervous and scared while making the statements. The trial court admitted the testimony pursuant to Rule 803(2). *Id.* We held that the trial court did not abuse its discretion in allowing the testimony. *Id.* The facts surrounding the making of Mrs. Fudge's statement in *Fudge* are substantially similar to the facts surrounding the making of Ms. Peterson's statements in this case.

We conclude that Ms. Peterson's statements related to a startling event and were made while she was under the stress of excitement caused by the event. Accordingly, the trial court did not commit error in admitting Ms. Wilfong's testimony pursuant to Rule 803(2) of the Rules of Evidence.

*4-3(h) Review*

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant, and no error has been found.

Affirmed.

IMBER, J., not participating.