Joe NEWTON *v.* STATE of Arkansas

CR 05-1247                                    237 S.W.3d 451

Supreme Court of Arkansas
Opinion delivered June 22, 2006

*Robinson & Associates, P.A.*, by: *Greg Robinson, Luke Zakrzewski,* and *Bryan Achorn,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Vada Berger,* Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice. Joe Gene Newton appeals his conviction of capital murder and sentence of life without parole. On appeal, Newton raises a single issue, which is whether the circuit court erred in denying his motion to suppress. We affirm Newton's conviction and sentence. Our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2).

In the late hours of December 13, 2003, or the very early hours of December 14, 2003, Greg Parker was stabbed to death. On December 14, 2003, Crossett police received a 911-call informing them that there was a body at the apartment complex located at 401 Main Street. Officer David Tumey was among the first officers to arrive. He testified that they found a black male lying on his back in front of an apartment. Tumey checked the man for vital signs and found none. Officer Cliff Bailey arrived shortly thereafter and took command of the crime scene. Bailey testified that a man was pacing nearby and talking nervously. The man identified himself as Terrance Adkins and identified the dead man as Greg Parker.

Officer Fred Hogan was also present at the crime scene and testified that there was some type of a mat lying under the body and what appeared to be marks on the concrete from the body leading back toward a nearby apartment door. Officer Bailey testified that there was a "bloody drag trail" from the body to the door of a nearby apartment. According to Officer Tumey, there was a "blood path" leading from the body to apartment A-3. The photographs and crime scene video clearly show a swath of blood leading from the body to apartment A-3, which was Newton's apartment.

Bailey testified that as he spoke with Adkins, Newton was standing behind a storm door just inside the doorway of his nearby apartment. According to Hogan, Bailey entered Newton's apart-

ment and asked Hogan to follow him. They took Adkins inside Newton's apartment with them. Hogan was directed by Bailey to watch Newton while Bailey spoke to Adkins. At this time, Newton was seated at his kitchen table. After discussing the presence of the body with both Adkins and Newton, Bailey directed Hogan to take Adkins and Newton outside and place them in police cars. Each was informed that he was not under arrest.

The scene was secured at this time. Officer Harold Pennington arrived and examined the scene near the body. He then observed spots of blood on the floor of Newton's apartment that he was able to see through Newton's storm door. Pennington entered the apartment and followed the spots of blood that took him into several rooms. Pennington videotaped the area outside and inside the apartment including floors, walls, and various objects on which blood could be seen, as well as damage done to the apartment such as broken glass in the living room. He seized an area rug from the living room and a pair of shoes from a bedroom. On December 15, 2003, Pennington appeared in court seeking a search warrant and offering as evidence in support of issuance of the warrant, the seized items and the videotape, along with other evidence such as the blood trail to Newtons' door. Pennington obtained a search warrant which he then executed on December 17, 2003.

In his motion to suppress, Newton argued that the search of his residence on December 14, 2003, and the search of his residence on December 17, 2003, were carried out in violation of the Fourth Amendment to the United States Constitution. At the hearing, Newton argued that the police searched his home without a warrant on December 14, 2003, in violation of his constitutional rights. Newton argued that this illegal search on December 14, 2003, tainted all evidence discovered and seized that night. He further argued that the State relied on the items illegally obtained on December 14, 2003, as evidence supporting issuance of the search warrant on December 15, 2003. This, Newton argues, means that all items seized pursuant to the search warrant were also tainted. He thus argued that all the seized evidence must be suppressed, or in other words, excluded at trial.

> The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, *Weeks* v. *United States*, 232 U.S. 383 (1914), and of testimony concerning knowledge acquired during an unlawful search, *Silverman* v. *United States*,

> 365 U.S. 505 (1961). Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint," *Nardone* v. *United States*, 308 U.S. 338, 341 (1939). *See Wong Sun* v. *United States*, 371 U.S. 471, 484–485 (1963).

*Murray v. United States*, 487 U.S. 533, 536–37 (1988). This court has likewise held that "the exclusionary rule commands that where evidence has been obtained in violation of search and seizure protections, the illegally obtained evidence cannot be used at the trial of the defendant." *Griffin v. State*, 347 Ark. 788, 793, 67 S.W.3d 582, 585 (2002).

However, the State argued that there was no illegal search giving rise to exclusion because the evidence seized on December 14, 2003, was in plain view; therefore, the search was not illegal, and the exclusionary rule did not apply. Under the plain-view doctrine, "[w]hen police officers are legitimately at a location and acting without a search warrant, they may seize an object in plain view if they have probable cause to believe that the object is either evidence of a crime, fruit of a crime, or an instrumentality of a crime." *Fultz v. State*, 333 Ark. 586, 593, 972 S.W.2d 222, 224–25 (1998) (citing *Arizona v. Hicks*, 480 U.S. 321 (1987)).

The circuit court found that the plain-view doctrine applied. The court noted that there was a blood trail to Newton's door, and that blood could be seen inside of Newton's apartment. Based on the blood seen inside the apartment, the court concluded that under the plain-view doctrine, the search was permissible. The plain-view doctrine is applicable if the officer has a lawful right of access to the object and if the incriminating nature of the object is readily apparent. *Williams v. State*, 327 Ark. 213, 939 S.W.2d 264 (1997). There must be a "lawful right of access to the object." *Fultz*, 333 Ark. at 593, 972 S.W.2d at 225 (citing *Horton v. California*, 496 U.S. 128 (1990)).

Because we have some misgivings about approving a warrantless entry under the facts of this case, our preference is to affirm for an alternative reason. The circuit court erred in its analysis. However, as the State argues, where the circuit court reached the correct result but for the wrong reason, we will not reverse the decision. *Flores v. State*, 348 Ark. 28, 69 S.W.3d 864 (2002).

The inevitable discovery rule applies to evidence that was illegally seized and provides that even though evidence is subject to suppression due to illegal conduct by police, it may still be admissible "if the State proves by a preponderance of the evidence that the police would have inevitably discovered the evidence by lawful means." *McDonald v. State*, 354 Ark. 216, 225, 119 S.W.3d 41, 47 (2003). The United States Supreme Court, in adopting the inevitable discovery rule, stated that "when . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide taint and the evidence is admissible." *Nix v. Williams*, 467 U.S. 431, 448 (1984). In *Nix,* Williams was convicted of kidnapping and killing a child. While police were transporting Williams, they asked and obtained information from Williams that led them to the child's body. This was done in the absence of counsel; therefore, in *Nix,* a Sixth Amendment violation was at issue. The Court noted in *Nix* that at the time the information was obtained from Williams, a search was underway using a grid system that included the area where Williams indicated the body would be found. The Court concluded that had Williams not led police to the body, "the body would have inevitably been found." *Nix*, 467 U.S. at 450.

In the present case, upon arriving at the scene, police found a body lying on a mat that had apparently been used to move the body. A blood trail stretched from the body to Newton's front door. There were no blood spatters on the walls or in the area surrounding the body, even though there were copious amounts of blood on the body. This gave police reason to believe that the death may have occurred elsewhere than at the location where the body was found. Through Newton's storm door, police could see blood on the floor inside his apartment. In addition, Newton had a cut on his leg. There was certainly reason to believe that a crime had been committed, and there was reason to believe that evidence concerning the crime would be found in Newton's apartment. However, the police did not seek a warrant and instead entered Newton's apartment without a warrant. After seizing the area rug and shoes, and taking the videotape, the search was terminated that night for various reasons, including procurement of a search warrant.

At the probable-cause hearing, the above-noted evidence as to the condition of the body and conditions near the

body, as well as the blood trail leading to Newton's door, were discussed and considered. While other matters such as conditions found in the apartment during the illegal search were discussed, evidence present outside the apartment, including the location of the body, the "bloody-drag trail," and blood visible on the floor inside the apartment, established probable cause to search Newton's apartment. While we have misgivings about the warrantless search on December 14, 2003, it was terminated with the intent of obtaining the search warrant, which was issued based on adequate probable cause. Even if police had not illegally entered Newton's apartment, they would have later entered under a valid search warrant and inevitably discovered the alleged tainted evidence. The circuit court reached the correct result and we affirm.

*Rule 4-3(h)*

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Newton, and no prejudicial error has been found. *Holland v. State*, 365 Ark. 55, 225 S.W.3d 353 (2006).

Affirmed.

GLAZE, J., concurs.