James C. FUDGE *v.* STATE of Arkansas

CR 99-1102                                        20 S.W.3d 315

Supreme Court of Arkansas
Opinion delivered June 29, 2000

*Marion Humphrey*, Judge;

*William R. Simpson, Jr.*, Public Defender, by: *Deborah R. Sallings*, Deputy Public Defender, for appellant.

*Mark Pryor*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant James Fudge was charged with capital murder in the death of his wife, Kimberly Fudge. Following a jury trial, he was convicted as charged and sentenced to death. He now brings this appeal in which he raises

five points for reversal. We find no merit in any of his arguments, and we affirm.

For his first point on appeal, Fudge argues that the evidence was insufficient to sustain the verdict of capital murder. When we review a challenge to the sufficiency of the evidence, we will affirm the conviction if there is substantial evidence to support it, when viewed in the light most favorable to the State. *Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690 (2000). Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.* Notably, the evidence may be either direct or circumstantial. *Sublett v. State*, 337 Ark. 374, 989 S.W.2d 910 (1999). Circumstantial evidence can provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.*

Whether the evidence excludes every hypothesis is left to the jury to determine. *Sera v. State*, 341 Ark. 415, 17 S.W.3d 61 (2000) (citing *Williams v. State*, 338 Ark. 97, 991 S.W.2d 565 (1999)). Upon review, this court determines whether the jury resorted to speculation and conjecture in reaching its verdict. *Gregory*, 340 Ark. at 247-48 (citing *Boone v. State*, 282 Ark. 274, 668 S.W.2d 17 (1984)). Two equally reasonable conclusions as to what occurred merely gives rise to a suspicion of guilt. *Id.* We will set aside a judgment based upon evidence that did not meet the required standards, and thus left the fact finder only to speculation and conjecture. *Id.* We now review the evidence presented in this case.

On Wednesday, December 24, 1997, Kimberly Fudge attended a Christmas Eve party at the apartment of her upstairs neighbor, Deborah Wilson. During the party, James Fudge came to Deborah's apartment, and told Kimberly that it was time for her to go home. Sometime after that, Deborah went to the Fudges' apartment to ask if she was coming back to the party; she found Kimberly "sitting on the couch, balled up." Kimberly did say, however, that she would be coming back up to the party.

Later that same evening, Kimberly came running to Deborah's apartment, acting nervous and scared and repeating "We've got to go, we've got to go." She would not immediately tell Deborah what was wrong. The two women picked up Kimberly's children and a friend, Donald Wilson, and went to the house of another

friend. While there, Deborah noticed that Kimberly had a cut on her face and bruises on her neck. When she asked what happened, Kimberly told her that Fudge had cut her lip, choked her, and forced her to have sex that night.

On Friday, December 26, Kimberly was again at Deborah's apartment. James came to the door and asked for Kimberly, and Deborah told him he was "wrong for what [he] did" to Kim. James replied, "You know I didn't mean to do that to her." Kimberly left with her husband that night. Later that evening, Deborah went to their apartment and knocked at the door, but received no answer. She went in the apartment, and saw that the lights were off and the TV was on. She also noticed that Kimberly's car, a black 1987 Chevrolet Celebrity, was gone. That evening was the last time Deborah saw Kimberly or James.

On Saturday, December 27, Kimberly was expected at her mother's house. When she failed to show up, her twelve-year-old daughter, Krystal Wade, called Kimberly's apartment looking for her. James answered the phone, and when Krystal asked for her mother, James told her, "If you are looking for her, you will never find her."

During that weekend, James went to the home of Robert Williams in Hensley and told Williams that he had "cut a dude" in the East End and was going to Redfield to wash the blood off of his car. On Sunday the 28th, he also went to the Pilot Travel Center, a truck stop in Galloway, and told a friend named Jerome Jones that he was looking for a ride to Dallas. On Monday, December 29, James returned to the travel center, driving a black 1987 Chevrolet Celebrity. He told Jerome that his wife had kicked him out and that he was still looking for a ride to Dallas. James offered Jerome the car, saying that he was about four months behind on the payments. Jerome agreed to take the car, and James gave him the keys and left.

Jones called his brother, Carl Jones, who came to the truck stop to pick up the Chevrolet. When Carl got the vehicle home, he found a pair of sandals under the passenger seat, as well as bleach and washing powder in the trunk. He also noticed that the floor mat was in the passenger seat, which was wet. When he removed the mat, he saw a reddish stain on the passenger seat. On Tuesday, December 30, Carl loaned the car to a friend named Larry Tyler for a few days. While Tyler was driving the car, he was pulled over by a North Little Rock police officer, who had noticed the tags were

registered to Kimberly Fudge, who had been reported missing by her mother on Monday, December 29. Tyler returned the car to Carl on Thursday, January 1, 1998.

On January 5, Robert Addey was walking through the woods near Woodson in an area of south Pulaski County less than three-quarters of a mile from Robert Williams's house. Addey noticed a hole in the dirt; as he kicked at the dirt, a foot appeared. He immediately contacted the police, who arrived along with the coroner and uncovered Kimberly's body. She had been stabbed repeatedly and buried face-down in a shallow grave, her hands tied behind her back with the sleeves of her jacket.

An arrest warrant was issued for James on January 7, 1998, and he was eventually located in Portland, Oregon, where he was arrested on January 26. Police detectives questioned him there, and he denied any involvement with Kimberly's murder. According to the story James gave at that time, he and his wife had had consensual sex on Christmas Eve, and afterwards, Kimberly left to go to a party at a friend's apartment. However, James said he was under a restraining order not to stay with his wife in her residence, and she had thrown him out of her apartment on Christmas day, 1997. He said that this was the last time he had seen his wife, and that he left town a day or two later. He denied having any kind of violent altercation with her.

A felony information was filed on February 26, 1998, charging James with capital murder. At James's trial, the prosecution put James's aunt, Lucy Taylor, on the stand, who testified that James owned a white car, but that after Christmas of 1997, she had seen him driving a black car that she thought belonged to Kimberly. Dr. Steven Erickson, Associate Medical Examiner at the State Crime Lab, testified as to the manner and cause of death. He stated that Kimberly had been stabbed repeatedly and suffered some blunt force trauma to the back of the head. She had received three stab wounds to her heart, as well as two that pierced her left lung. She also had two other wounds to her lower chest, one to her stomach and liver, another shallow wound to the mid-abdomen, and three wounds to her right leg. There were also small cuts on her hands, a cut on her chin, a large bruise on the back of her head, and some swelling around her bottom lip and right eye. Although he was unable to pin down an exact time or date of death, Erickson stated that, given the cool weather conditions and the fact that Kimberly had been buried in watery mud, that would be consistent with her

having been killed sometime between December 27 or 28, 1997, and a day or two before she was found on January 5, 1998.

Lisa Channell, a forensic serologist for the State Crime Lab, testified that she recovered blood samples from the interior of the car, and that the blood spatter pattern indicated that the blood had originated from the front passenger seat. She also noted that the blood had been smeared, as though someone had attempted to clean the interior of the vehicle. Philip Raines, a forensic biologist, testified that a DNA analysis of the blood taken from the car matched Kimberly's (the chances of it being someone else's blood were 17 trillion to one).

At the close of the State's case, James moved for a directed verdict, which the trial court denied. James then put on only a few witnesses: the police officer who pulled Larry Taylor and Joe Norris over in Kimberly's car; Ann Hoff, a trace evidence analyst from the Crime Lab, who testified that she obtained some soil and vegetation samples from the car; and Lisa Sakevicius, chief criminalist at the Crime Lab, who stated that she was unable to determine with specificity where the soil and hair samples taken from the car had come from. At that point, James renewed his motion for directed verdict, which the court again denied. The jury then convicted him of capital murder, and, after deliberating on sentencing, it found one aggravating factor, which outweighed the one mitigating circumstance and justified beyond a reasonable doubt a sentence of death.

■ From the foregoing, it can be seen that the evidence does not admit of any other reasonable conclusion than the appellant's guilt. Certainly, it does not give rise to a "theory that one other than the defendant has committed the crime," *Gregory*, 341 Ark. at 248. Presented with this evidence, the jury did not have to resort to speculation and conjecture to conclude that James was indeed responsible for Kimberly's death; thus, the judge did not err in denying James's motion for directed verdict.

James's second argument is that the trial court erred in refusing to instruct the jury on second-degree murder. At the close of his case, James asked the court to give AMCI 2d 1103, which would have instructed the jurors that they could convict him of second-degree murder if the State proved that he knowingly caused the death of Kimberly under circumstances manifesting extreme indifference to the value of human life. The court refused this instruc-

tion and instructed the jury only on capital and first-degree murder. The jury then convicted James of capital murder, finding that he had killed Kimberly with a premeditated and deliberated purpose.

■ While it is reversible error to refuse to give an instruction on a lesser included offense when the instruction is supported by even the slightest evidence, *Spann v. State*, 328 Ark. 509, 513, 944 S.W.2d 537 (1997), it is not error for the court to refuse or fail to instruct on the lesser offense where the evidence clearly shows that the defendant is either guilty of the greater offense charged or innocent. *Brown v. State*, 321 Ark. 413, 903 S.W.2d 160 (1995). *See also* Ark. Code Ann. § 5-1-110(c) (Repl. 1997); *Doby v. State*, 290 Ark. 408, 720 S.W.2d 694 (1986) (holding that a lesser included offense instruction need not be given unless there is a rational basis for doing so).

■ ■ As demonstrated above, the evidence clearly showed that James was guilty of the greater offense, capital murder. In addition to the facts set out above which show that James committed the murder, the element of premeditation and deliberation could be inferred from circumstantial evidence such as the type and character of the weapon used; the manner in which the weapon was used; and the nature, extent, and location of the wounds inflicted. *Lever v. State*, 333 Ark. 377, 971 S.W.2d 762 (1998). Kimberly was stabbed at least a dozen times, three times directly in the heart and twice in the left lung. Certainly, a jury could infer the premeditation and deliberation necessary for a conviction of capital murder from the nature and extent of these wounds alone. Thus, the trial court's refusal to give the requested instruction was not error.

■ James also asserts that the so-called "skip rule" should not apply. This rule provides that when a lesser included offense has been given, and the jury convicts of the greater offense, error resulting from the failure to give an instruction on another still lesser included offense is cured. *McFarland v. State*, 337 Ark. 386, 989 S.W.2d 899 (1999); *Cooper v. State*, 324 Ark. 135, 919 S.W.2d 205 (1996). James contends that this rule is inapplicable because there is no meaningful distinction between capital and first-degree murder, and as such, the jury may well have chosen to convict him only of second-degree murder had they only been given the option. We reject this argument because we have held repeatedly that capital murder and first-degree murder are distinct crimes. *See Lever*, 333 Ark. at 380.

█ In addition, James argues that there was a rational basis for the jury to determine that this murder, although perhaps intentional, was not premeditated or purposeful "but rather was done by one who did not care, at the time, whether Kimberly lived or died, that is, under circumstances manifesting extreme indifference to the value of human life." However, the evidence presented at trial simply does not support this contention. As just discussed, there was certainly sufficient evidence from which the jury could have found premeditation and deliberation. The act of stabbing someone a dozen times indicates some degree of intent beyond not caring whether that person lives or dies; it shows a kind or level of purpose that rises to premeditation and deliberation. Thus, there is no merit to this argument.

For his third point on appeal, Fudge argues that the trial court erred when it permitted the prosecution to adduce testimony from witnesses Deborah Wilson and Donald Brinkley about statements Kimberly had made to them on Christmas Eve about violence committed against her by James. Both witnesses were allowed to testify that Kimberly told them that James had beaten her, choked her, and forced her to have sex. The court allowed these statements under the excited utterance exception to the hearsay rule, specifically relying on *Moore v. State*, 317 Ark. 630, 882 S.W.2d 667 (1994).

██ Decisions by a trial court with respect to evidentiary rulings are entirely within the court's discretion, and will not be reversed absent an abuse of that discretion. *Webb v. State*, 327 Ark. 51, 938 S.W.2d 806 (1997). The excited utterance exception is found at Ark. R. Evid. 803(2); that rule provides that a statement will not be excluded as hearsay if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In *United States v. Iron Shell*, 633 F.2d 77 (8th Cir. 1980), the federal court of appeals listed several factors to consider when determining if a statement falls under this exception: the lapse of time (which is relevant, but not dispositive), the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement. In addition, "[i]n order to find that 803(2) applies, it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." *Iron Shell*, 633 F.2d at 85-86.

This court adopted these factors in *Moore v. State*, 317 Ark. 630, 882 S.W.2d 667 (1994), where we also said that, "[f]or the . . . exception to apply, there must be an event which excites the declarant. Also, the statements must be uttered during the period of excitement and must express the declarant's reaction to the event." *Moore*, 317 Ark. at 633. We added that it is within the trial court's discretion to determine whether a statement was made under the stress of excitement or after the declarant has calmed down and had an opportunity to reflect. *Id.* at 634 (citing *Marx v. State*, 291 Ark. 325, 724 S.W.2d 456 (1987)).

In the instant case, although there was some lapse of time (anywhere from one to several hours) between the events in Kimberly's apartment and her relating those events to Deborah Wilson and Donald Brinkley, that lapse of time alone is not determinative. *See Greenlee v. State*, 318 Ark. 191, 884 S.W.2d 947 (1994) (general rule is that an utterance following an exciting event must be made soon enough thereafter that it can reasonably be considered a product of the stress of the excitement, rather than of intervening reflection or deliberation). *See also Cole v. State*, 307 Ark. 41, 818 S.W.2d 573 (1991); *Smith v. State*, 303 Ark. 524, 798 S.W.2d 94 (1990) (general rule is that an utterance following an exciting event must be made soon enough thereafter that it can reasonably be considered a product of the stress of the excitement rather than of intervening reflection or deliberation; the trend is toward expansion of the time interval after an exciting event). Deborah testified both at trial and at a pre-trial suppression hearing that Kimberly appeared nervous and scared from the time she ran upstairs to Deborah's apartment until the moment when she told Deborah and Donald what had happened to her.

In addition, although James argues that Kimberly's statements were made after some deliberation and in response to questioning from Deborah, Deborah only asked her what happened to her lip. Kimberly's response that James had beaten, choked, and raped her were clearly not in response to a question about her lip. Given the court's position to view Deborah's testimony about Kimberly's demeanor when she made the statement, it cannot be said that the court abused its discretion in allowing the testimony.

The fourth point on appeal is James's contention that the trial court erred in admitting victim impact evidence on the grounds that such evidence is irrelevant under Arkansas's capital sentencing procedure. This precise argument was recently discussed

in *Engram v. State,* 341 Ark. 196, 15 S.W.3d 678 (2000). In that case, we specifically noted that the General Assembly has unequivocally declared that victim–impact evidence is relevant to a jury's determination of the appropriateness of the death penalty. *Engram,* 341 Ark. at 209. *See also* Ark. Code Ann. § 5-4-602(4) (Repl. 1997); *Noel v. State,* 331 Ark. 79, 960 S.W.2d 439 (1998). Because this issue was discussed at length in that recent opinion, we will not repeat it here. Suffice it to say, James has provided no reason why we should hold differently at this time; consequently, we reject this point.

The final point that James raises for reversal is that Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1997), the capital murder statute, is unconstitutional as void for vagueness and because of its overlap with Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1997). However, he recognizes that this court has repeatedly rejected this contention, citing *Sanders v. State,* 317 Ark. 328, 878 S.W.2d 391 (1994), and *Cromwell v. State,* 269 Ark. 104, 598 S.W.2d 733 (1980). Nonetheless, he asks us to reconsider our previous rulings.

In *Lee v. State,* 327 Ark. 692, 942 S.W.2d 231 (1997), we stated simply that "[w]e have decided this issue adversely to Lee's position on many occasions, and adhere to these previous holdings." *Lee,* 327 Ark. at 702. Similarly, in *Nooner v. State,* 322 Ark. 87, 907 S.W.2d 677 (1995), we stated that we have "discounted this argument on numerous occasions." *See, e.g., Greene v. State,* 317 Ark. 350, 878 S.W.2d 384 (1994); *Sanders v. State,* 317 Ark. 328, 878 S.W.2d 391 (1994); *Buchanan v. State,* 315 Ark. 227, 866 S.W.2d 395 (1993); *Mauppin v. State,* 309 Ark. 235, 831 S.W.2d 104 (1992); *Van Pelt v. State,* 306 Ark. 624, 816 S.W.2d 607 (1991); *Smith v. State,* 306 Ark. 483, 815 S.W.2d 922 (1991). *Nooner,* 322 Ark. at 105-06. Similarly, on this occasion, we adhere to our previous decisions, and we reject this argument.

In accordance with Ark. Sup. Ct. R. 4-3(h) (1998), the record has been reviewed for adverse rulings objected to by appellant James Fudge but not argued on appeal, and no reversible error was found.

Affirmed.