Cite as 2024 Ark. App. 206

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CR-23-174

| | |
|---|---|
| JACOB MICHAEL LESTER<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | Opinion Delivered March 27, 2024<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. 72CR-18-2080]<br><br>HONORABLE MARK LINDSAY, JUDGE<br><br>AFFIRMED |

**BART F. VIRDEN, Judge**

Jacob Michael Lester appeals his conviction of three counts of accomplice to rape and one count of accomplice to kidnapping.[1] Lester asserts the circuit court erred by excluding evidence under the rape-shield law; admitting hearsay testimony; and admitting irrelevant statements made by a police officer during his interview of Lester. He also asserts that there was insufficient evidence that he was an accomplice to rape. We affirm.

## I. *Relevant Facts*

On July 11, 2018, Lester was charged with three counts of accomplice to rape and one count of accomplice to kidnapping. The felony information described the three

---

[1]It appears that Lester has abandoned on appeal his conviction for accomplice to kidnapping. Issues raised below but not argued on appeal are considered abandoned. *Jordan v. State*, 356 Ark. 248, 147 S.W.3d 691 (2004).

accomplice-to-rape charges as follows: Count 1—"the defendant and another person penetrated the anus of another person without the victim's consent"; Count 2—"the defendant and another person forced the victim to perform oral sex on him"; and Count 3—"the defendant and another person penetrated the anus of another person with a foreign object without the victim's consent[.]"

On November 17, 2021, Lester filed a motion in limine to present evidence pursuant to an exception to the rape-shield statute. Specifically, he alleged that the victim "had a recent history of engaging in sexual conduct similar to the allegations in this case through consensual, 'role-playing' behavior." Lester asserted that the evidence was necessary to his defense of consent. On August 19, 2022, Lester filed another motion in limine, this time requesting that the court exclude eight recorded statements Detective William Mason made during his custodial interview of Lester.

A hearing on the motions was held on August 26, and the court first addressed Officer Mason's statements. After hearing extensive argument, the court admitted five of the statements outright and one statement as modified. Two of Officer Mason's statements were excluded as prejudicial or "offensive." Next, the court heard argument regarding Lester's motion to admit messages and correspondence exchanged between the victim and other men regarding the "fetish lifestyle." The court denied the admission of the correspondence as irrelevant and withheld ruling on cross-examination of the victim regarding the fetish lifestyle.

The following evidence and testimony were adduced at trial. In May and June 2018, the victim corresponded with Lester and Brandon Mooney by direct message through a website called Recon.[2] Over the course of a few weeks, the men discussed their interests. Lester and Mooney's relationship involved Mooney acting as Lester's "slave," who was obedient to Lester's orders, and Lester asked the victim if he was interested in the "master-slave dynamic." The victim stated that he was not and explained that he was more interested in "pup play," wherein a submissive partner pretends to be a dog. Pup play can be sexual or nonsexual. Mooney was experienced in pup play, and the victim agreed to go to Lester's home outside of Goshen to be trained in pup play. On June 7, 2018, the victim arrived at Lester's house, and Mooney answered the door wearing only an athletic supporter. Mooney told the victim that Lester was "the Master" and he, Mooney, was "the Alpha" or "Astro."[3] The victim was given the choice to remain clothed or disrobe. The victim chose to remove his clothing and begin his training, which included drinking water from a bowl on the floor and wearing a hood and mittens (worn to simulate a dog's head and paws.) The victim stated that he "got a whiff of something funny" in the water but drank about half of it anyway. Mooney asked Lester's permission to perform oral sex on the victim, and Lester allowed it. At this time, the victim was a willing participant. When asked if the victim had told anyone of his whereabouts, he stated that he had not, and Lester and Mooney admonished him for

---

[2]Recon is a website mostly used by gay men to meet others with similar fetish interests.

[3]"Astro" is Mooney's pup-play name.

not doing so, telling him "horror stories" of others who had failed to let someone know their location and who they were with. The victim began to feel "woozy" and was not thinking "super clearly," and Lester later admitted he had put Haldol, an antipsychotic drug, in the victim's water. Mooney led the victim into the "torture room" or "playroom," which contained BDSM,[4] devices, including whips, floggers, a ball gag with a rubber tube used for introducing liquids to the mouth of the person wearing the gag, and a metal chastity device that prevents the wearer from getting an erection. The ceiling was equipped with two D-rings, and there was a chain strung through the rings with handcuffs on each end of the chain. Lester stated that the victim would "make a great addition to the household," and he was handcuffed to the chain. The victim believed that he "wasn't going to be able to leave anytime soon" and begged to be released. Initially, the victim was able to escape the handcuffs; however, as he was running to the door of the torture room, Lester tackled him and pressed his arm against the victim's throat, cutting off his air supply. The victim stated that Lester "was definitely overpowering me." Lester told him that he "needed to comply if [he] didn't want to pass out[.]" After this, the victim complied because he was afraid of Lester. The victim was handcuffed and hung from the ceiling and the ball gag was placed in his mouth and secured to his head. Mooney inserted an anal plug in the victim's anus. The victim continued to beg to be released, but his requests were ignored. Lester instructed

---

[4]BDSM stands for bondage and discipline, dominance and submission, sadism and masochism.

Mooney to train the victim to be a slave, and Mooney explained to the jury, "So, that's what I learned as a slave, is pain is a great motivator." For about an hour, Mooney beat the victim with various implements on his back, buttocks, thighs, and testicles, and Lester whipped the victim with a cat o' nine tails, a device with nine lashes and a barb at the end of each lash. Lester reminded the victim that if he had told someone where he was going, this would not have happened. After letting the victim hang for another half hour, antibiotic ointment was applied to his wounds. The victim asked to use the bathroom, and Mooney allowed him to urinate in a cup. Lester then poured the urine into the tube in the ball gag. The victim spat it out and was beaten for doing so. The victim was released from the handcuffs and, after tying his wrists together, the men went into the living room and watched television. Lester gave Mooney permission to force the victim to perform oral sex on him, and Mooney threatened him with more beatings if he did not comply. The victim was forced to eat food from a dog bowl on the floor, a shock collar was placed around his neck, and a metal chastity device was locked onto his genitals. The victim was instructed to call Lester "Master" and Mooney "Alpha." The men returned to the torture room, and Lester instructed Mooney to remove the anal plug. The victim immediately evacuated his bowels, and as Mooney cleaned the area, Lester anally raped the victim. After that, Lester took the victim into the shower to wash himself. Everyone returned to the living room, and with Lester's permission, Mooney removed the chastity device and performed oral sex on the victim. When the victim was unable to ejaculate, Mooney punished him by beating him and replaced the chastity device. That night, Lester slept in a separate bedroom, and Mooney slept with the victim in the

torture room. Initially the victim's hands were tied behind his back, but when he could not sleep, Mooney tied his hands in front of him, wrapped a cord around his genitals, then tied that cord to the victim's feet so that if he tried to pull his feet, it would "yank [his] genitals." The next morning, Lester told Mooney to "hook [the victim] back up" and continue slave training. For about two hours, the victim was beaten with the cat o' nine tails and a paddle wrapped in duct tape. Lester instructed Mooney to ask for the victim's bank account information, which made him more afraid. After that, Mooney forced the victim to run in circles around the yard for exercise. The chastity device was removed, and Mooney sexually stimulated the victim. When the victim was unable to ejaculate, Mooney beat him again as Lester gave Mooney directions. Mooney and the victim returned to the living room and watched The Hunger Games movies, and during the movies, Mooney forced the victim's mouth onto his penis as he ejaculated. The chastity device was removed from his genitals as a reward, though it was replaced later that evening. When the movies ended, the victim was forced back into the handcuffs and beaten. An electrical muscle-stimulation device was attached to the victim's nipples, delivering electrical shocks. Mooney stated that the victim did not consent to any of the events following the first time Mooney performed oral sex on him; and at bedtime, Mooney decided to allow the victim to sleep unrestrained because the victim obviously did not want to participate, and it was "too painful to watch." Mooney hoped that when he fell asleep, the victim would escape. The victim awoke the next morning before Lester and Mooney did. He put on his shoes, which were by the door, wrapped himself in a blanket and ran from the home through the rural, wooded area. Eventually, the victim

rang the doorbell at Mark McClarty's home, and McClarty opened the door finding the victim, "very upset" and "winded." Over a hearsay objection, McClarty testified that the victim told him that he had escaped from a house about half a mile away. McClarty invited him inside and called the police. The victim was taken to the hospital, where the police interviewed him and a nurse with sexual-assault training documented his injuries. The victim's injuries included cuts and bruises to his neck, head, back, hip, thighs, upper and lower legs, chest, abdomen, arms, penis, and scrotum. The nurse attributed the injuries to blunt impact and there were signs of strangulation, though the nurse explained that an arm placed across the trachea will cause difficulty breathing without leaving any marks. A locksmith removed the chastity device.

Meanwhile, Lester and Mooney had awakened and discovered that the victim had escaped. They cleaned the torture room, removing the BDSM devices, pup-play gear, tubing, Haldol, a notebook containing the victim's personal information, and straps and restraints. Lester removed the D-rings from the ceiling and spackled and painted the holes. Lester instructed Mooney to wipe down everything with a rag and hydrogen peroxide and put all the victim's things in his car. The torture room was straightened up "so it looks like it—it hasn't been used in a while" and made to look like "a sitting room." Lester and Mooney moved the victim's car to a secluded place on the property and then went for a drive to look for him. Lester instructed Mooney to delete the Recon account, which he did. That afternoon, a search warrant was obtained, and during the search, police officers found the BDSM devices, pup-play gear, and the rest of the objects that had been in the torture room

in an outbuilding on the property. Police found the victim's driver's license in the home and his car on the property with the keys and his clothing inside.

Lester was arrested for his involvement with the victim's rape and kidnapping, and the jury found him guilty on all charges. Lester was sentenced to fifty years' incarceration in the Arkansas Department of Correction. This appeal follows.

## II. *Discussion*

### A. Sufficiency of the Evidence

#### 1. *In-court identification*

Lester raises several evidentiary issues on appeal; however, double-jeopardy concerns require us to first address the sufficiency challenges. *Taffner v. State*, 2018 Ark. 99, 541 S.W.3d 430. Preservation of an appellant's right to freedom from double jeopardy requires a review of the sufficiency of the evidence prior to a review of trial errors. *Harris v. State*, 284 Ark. 247, 681 S.W.2d 334 (1984).

For his first point regarding sufficiency, Lester contends that the circuit court erred in denying his motion for directed verdict because none of the witnesses in the courtroom identified him as the offender. His argument fails.

On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Price v. State*, 2010 Ark. App. 111, 377 S.W.3d 324. We affirm a conviction if substantial evidence exists to support it. *Id.*

Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* The duty of resolving conflicting testimony and determining the credibility of witnesses is left to the discretion of the jury. *Kelley v. State*, 375 Ark. 483, 292 S.W.3d 297 (2009).

The State must prove that "the person who stands before the court in the position of the defendant is the one whom the indictment or information accuses and to whom the evidence is supposed to relate." *Davis v. State*, 2022 Ark. App. 510, at 3, 657 SW.3d 207, 211 (quoting *Womack v. State*, 301 Ark. 193, 198, 783 S.W.2d 33, 36 (1990)). However, this identification can be inferred from all the facts and circumstances in evidence. *Id.* In *Becker v. State*, 298 Ark. 438, 441, 768 S.W.2d 527, 529 (1989), our supreme court held that there was sufficient proof of identity when the defendant was tried alone and was specifically identified as both "Mr. Becker" and "the defendant" throughout the trial. The witnesses were eyewitnesses to the robbery, and "the fact that none of them pointed out that the wrong man had been brought to trial was eloquent and sufficient proof of identity." *Id.* Here, Lester was tried alone and was repeatedly referred to throughout the trial as Lester, "Master," and the defendant. Both Mooney and the victim were witnesses to the crimes and testified at trial, and neither man stated that the wrong man had been brought to trial. Finally, the jury watched a video of Lester's interview with Detective Mason and was able to compare Lester's appearance in the video with the defendant at trial. In light of these facts, we hold that

substantial evidence supports the proof of Lester's identity as the offender. *See Davis*, 2022 Ark. App. 510, at 3, 657 S.W.3d at 211.

## 2. *Accomplice to rape*

Next, Lester argues that the circuit court erred by denying his directed-verdict motion on the "Count 1" accomplice-to-rape charge, arguing that the State failed to prove he was Mooney's accomplice when he (Lester) had anal sex with the victim. Specifically, Lester contends that the victim "testified that, during the anal sex, he and Lester were alone"; thus, Lester asserts that he does not meet the definition of "accomplice" because he could not be an accomplice to his own actions. His argument is not well taken.

"[T]here is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned." *Price v. State*, 2019 Ark. 323, at 5, 588 S.W.3d 1, 5. When two people assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Id.* Here, Lester instructed Mooney to remove the anal plug from the victim's anus, which he did. Immediately after, Lester anally raped the victim; thus, the jury could have reasonably concluded without resorting to speculation or conjecture that Lester's accomplice, Mooney, removed the anal plug, which allowed Lester to anally rape the victim.

## 3. *Sufficiency of the evidence of anal rape*

Next, Lester argues that there is insufficient evidence that he anally raped the victim because the victim testified that he did not protest Lester's actions; thus, there was no evidence that he compelled the victim through physical force, threat of death of physical

injury, or kidnapping. Lester does not appeal both possible grounds for his rape conviction on "Count 1"; thus, if sufficient evidence supports the jury's verdict on either ground, we will affirm.

The State directs us to the verdict forms in addressing this point, contending that it is not preserved for review. The State explains that the jury received the instructions that Lester could be convicted of Count 1 if the proof showed that Lester or Mooney penetrated the victim's *anus or mouth* with his penis. The general verdict form includes the handwritten notation "Count 1" and provides, "We, the Jury, having found Jacob Lester guilty of Rape . . . ."; thus, the jury found Lester guilty of rape without specifying whether the rape was anal or oral. During the trial, the State offered evidence of both oral and anal rape that the jury could consider pursuant to the Count 1 jury instructions. In his argument on appeal, Lester does not address any of the oral rapes committed by Mooney. Lester fails to address the instances of both anal *and* oral rape; thus, the State asserts, we must affirm if there is sufficient evidence that either Mooney or Lester committed oral or anal rape.

In reply, Lester asserts that the Count 1 instruction refers only to Lester's anal rape of the victim because the jury instruction was marked "Count 1" written in by hand. Lester cites the felony information that provides:

> **Count 1:** . . . the said defendant did unlawfully and knowingly engage in sexual intercourse or deviate sexual activity with another person, by forcible compulsion, in violation of ACA §5-2-403 & 5-14-103(a)(1), to-wit: the defendant and another person *penetrated the anus* of another person without the victim's consent[.]

(Emphasis added.)

11

Lester also contends that the State told the jury during closing argument that Count 1 was "for anal sex for the penetration of [the victim's] anus by the penis of another—by the defendant[.]" In summary, Lester argues that the description of Count 1 in the felony information, the "Count 1" notation on the jury instruction and the general verdict form, and counsel's statements during closing argument demonstrate that the jury was instructed to consider Lester's role in only anal rape of the victim. We disagree.

*Taylor v. State*, 2010 Ark. 372, 372 S.W.3d 769, supports the State's argument. In *Taylo*r, our supreme court held that the "State submitted to the jury two theories on which it could find appellant committed capital murder—felony murder and premeditated and deliberated murder" and

> [b]ecause the capital-murder charge was submitted to the jury as a *general verdict*, the jury did not specify if it had found upon the basis of felony murder, premeditated and deliberated murder, or both. Moreover, appellant fails in his brief to challenge the sufficiency of the capital-murder conviction on the basis of felony murder. However, we will affirm a general verdict without regard to the State's proof on a particular element of a charge if there is sufficient evidence to convict on the alternative ground. *Williams v. State*, 347 Ark. 728, 67 S.W.3d 548 (2002). Thus, we may affirm the capital-murder conviction if there was sufficient evidence to prove appellant, with premeditation and deliberation, caused the death of the victim.

*Taylor*, 2010 Ark. 372, at 13–15, 372 S.W.3d at 778 (emphasis added).

In the instant case, the verdict form provided the following:

AMCI 2d 1404
RAPE
Count 1 (handwritten)

Jacob Lester is charged with the offense of Rape. To sustain this charge the State must prove the following things beyond a reasonable doubt:

12

First: That Defendant engaged in deviate sexual activity with [the victim]; and

Second: That Jacob Lester did so by forcible compulsion.

Definitions

"Deviate sexual activity" means any act of sexual gratification involving the penetration, however slight, of the *anus or mouth* of one person by the penis of another person.

"Forcible compulsion."—means physical force or a threat, express or implied, of death or physical injury to or kidnapping of any person.

The general jury instruction clearly includes language regarding rape involving penetration of the victim's anus *or mouth* by the penis of another. The State submitted two theories for the jury to consider under the general jury instruction for Count 1, including (1) Lester anally raped the victim by inserting his penis into the victim's anus, and (2) Mooney orally raped the victim several times. As in *Taylor*, the jury reported its verdict on general verdict forms that did not specify the specific details of the rape; thus, if there is sufficient evidence to prove that Lester raped the victim or was an accomplice to any of the rapes that Mooney perpetrated, we must affirm Lester's conviction.

A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person by forcible compulsion. Ark. Code Ann. § 5-14-103(a)(1) (Repl. 2013). Deviate sexual activity "means any act of sexual gratification involving the penetration, however slight, of the anus or mouth of a person by the penis of another person or of the labia majora or anus of one person by anybody member or foreign instrument manipulated by another person." Ark. Code Ann. § 5-14-101(1)(A)–(B) (Supp. 2023). A rape

victim's testimony alone can constitute substantial evidence to support a rape conviction. *Henson v. State*, 2009 Ark. App. 464, 320 S.W.3d 19. The jury has the sole authority to evaluate the credibility of evidence and to apportion the weight to be given to the evidence. *Starling v. State*, 2016 Ark. 20, 480 S.W.3d 158.

Here, the victim testified he did not consent to any sexual activity after the first time that Mooney performed oral sex on him shortly after his arrival. Thereafter, when he tried to escape, Lester tackled him, choked him, and threatened him with physical harm if he resisted. The victim testified that he was told this was a kidnapping, and he believed that Lester would physically harm him if he tried to resist. Both Mooney and the victim stated that he asked them to stop, and he told them he wanted to go home. The victim testified that an anal plug was placed in his anus without his consent, and Lester confirmed that he instructed Mooney to do so in the police interview played for the jury. The victim and Mooney testified that Lester anally raped him, and Lester stated that he had anal sex with the victim. Mooney and the victim testified that he was repeatedly forced to perform oral sex on Mooney. As stated above, a victim's testimony that he was raped is sufficient to uphold a conviction; thus, we affirm Lester's conviction of accomplice to rape. *See Henson*, *supra*.

Lester also asserts that his conviction of the second count of rape by inserting a foreign object into the victim's anus, the anal plug, is not supported by sufficient evidence because the victim consented as a part of "pup play." He is wrong. As stated above, the victim's testimony that he did not consent to having the anal plug inserted into his anus is sufficient to uphold Lester's conviction for rape. *See id.*

14

B. Evidentiary Issues

1. *The rape-shield law*

On appeal, Lester asserts that the circuit court's exclusion under the rape-shield law of correspondence regarding similar consensual activity with other men is reversible error. He argues that the victim's previous correspondence does not constitute "sexual conduct" because activities such as "putting a collar or leash on a person, blindfolding them, putting clothes pins on their nipples and testicles, having other people watch them engage in sexual activity, and tying them up" do not meet the statutory definition of "sexual conduct"; thus, the correspondence is not excludable by the rape-shield law. Lester's argument is flawed.

We review the circuit court's exclusion of rape-shield evidence under an abuse-of-discretion standard of review. *Vance v. State*, 2011 Ark. 392, at 6, 384 S.W.3d 515, 519. This discretion is "broad." *Id.* More specifically, regarding evidence subject to the rape-shield statute, we have said that the circuit court is vested with a great deal of discretion in ruling whether evidence is relevant. *Id.* Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Furlow v. State*, 2023 Ark. App. 192, at 5, 664 S.W.3d 457, 462. We will not reverse the circuit court's decision as to the admissibility of rape-shield evidence unless its ruling constitutes clear error or a manifest abuse of discretion. *Id.*

Arkansas Rule of Evidence 411(b) provides that evidence of specific instances of the victim's prior sexual conduct is not admissible to prove consent or for any other purpose.

15

Evidence of the victim's prior sexual conduct with the defendant or any other person may be admitted at the trial if the court determines that the evidence is relevant to a fact in issue, and its probative value outweighs its inflammatory or prejudicial nature. Ark. R. Evid. 411(c)(2)(C). The purpose of the rape-shield statute is to shield victims of rape or sexual abuse from the humiliation of having their sexual conduct, unrelated to the pending charges, paraded before the jury and the public when such conduct is irrelevant to the defendant's guilt. *Wilder v. State*, 2023 Ark. 137, 675 S.W.3d 424.

At the pretrial hearing, Lester asserted that if the victim "consented in the past to this type of conduct," then it is reasonable that he consented to conduct with Lester and Mooney. Lester contended that in a message chain, the victim agreed to meet up with another man and engage in "kinky sex acts that are not dissimilar to what is going on in this case." The sex acts the victim discussed in his prior correspondence with other men involved bondage, restraints, or seemingly forced acts of sex that appear nonconsensual but, in fact, are consensual; thus, Lester argued, the messages between the victim and other men regarding the fetish lifestyle should be admitted to show that though the acts may seem like rape, they are actually consensual. He asserted that the messages were relevant "to determine whether or not it was reasonable for somebody to believe consent was even withdrawn." The court disagreed, stating that consenting to sex with one person "in no way indicates that you didn't decide to say 'no' with someone totally different." The court ruled that the messages were irrelevant and had no probative value.

16

Next, Lester contended that the fetish lifestyle is an "identity" that does not always include "sexual conducts, deviate sexual activity, or sexual intercourse with anyone else." The court initially ruled that the fetish lifestyle constituted sexual conduct. Then, after further discussion, the court reserved its ruling on whether Lester could cross-examine the victim regarding the fetish lifestyle, stating that "I don't know what's coming up about the fetish lifestyle. . . . I will rule on that if and when it comes up." It is the obligation of an appellant to obtain a ruling from the circuit court to preserve an issue for appellate review. *Vance*, 2011 Ark. 392, 384 S.W.3d 515. Not only did the court decline to rule, it appears that the court left open the possibility that *some* aspects of the fetish lifestyle are not sexual conduct and are relevant and probative. Because Lester did not obtain a ruling that the court determined that evidence of the fetish lifestyle is sexual conduct according to the statutory definition or that testimony concerning the fetish lifestyle is probative of whether the victim's consent was withdrawn, the issue is not preserved for appeal.

Lester also appears to argue that the rape-shield statute does not apply here because sexual conduct includes only acts committed *by* a person and not *to* a person. His argument is not preserved because it was not made to the circuit court and is being raised for the first time on appeal. Arguments not raised at trial will not be addressed for the first time on appeal. *McLemore v. State*, 2022 Ark. App. 512, 657 S.W.3d 190.

*2. Excited utterance*

17

On appeal, Lester challenges the circuit court's ruling that the victim's response to McClarty's question "Is someone after you?" falls under the excited-utterance exception to the rule against hearsay. His argument is not preserved for appeal.

An "excited utterance" is an exception to the rule against hearsay. To be an excited utterance, the statement must appear to be spontaneous, excited, or impulsive rather than the product of reflection and deliberation. *Rodriguez v. State*, 372 Ark. 335, 276 S.W.3d 208. The relevant inquiry is whether the statement was made under the stress of excitement or was made after the declarant calmed down and had an opportunity to reflect, which is a matter within the circuit court's sound discretion. *Id.* (citing *Fudge v. State*, 341 Ark. 759, 769, 20 S.W.3d 315, 320 (2000)). Admissibility is not to be measured by any precise number of minutes, hours, or days but requires that the declarant is still under the stress and excitement caused by the event. *Ludwick v. State*, 2021 Ark. App. 347, 635 S.W.3d 330.

On appeal, Lester asserts that the statement was not made soon enough after the incident to be considered a product of the stress of the incident rather than intervening reflection or deliberation. Specifically, Lester argues that "there was no evidence of how long it had been since [the victim] left [Lester's] house, no evidence that he was in a hurried state, and the house was more than half a mile away." In contrast, at trial, Lester objected to the victim's testimony as hearsay because "he's already said that these events were *a day or two before* so excited utterance, I don't believe is applicable for a long line of testimony[.]" Lester's argument to the circuit court was based on the stressful events that had taken place a day or two before the excited utterance, whereas his argument on appeal is based on the victim's

18

escape from Lester's home that morning. Parties cannot change the grounds for an objection on appeal but are bound by the scope and nature of their objections as presented at trial. *Hicks v. State*, 2017 Ark. 262, 526 S.W.3d 831. Accordingly, the issue is not preserved for our review.

### 3. *Statements made by Officer Mason during Lester's interview*

Lester contends that the circuit court abused its discretion by admitting certain statements Officer Mason made during his interview of Lester because the statements were irrelevant, and or unfairly prejudicial. We disagree.

Irrelevant evidence is inadmissible. Ark. R. Evid. 402. Evidence is relevant only if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ark. R. Evid. 401. However, even relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. Ark. R. Evid. 403. All evidence offered by the State in a criminal trial is likely to be prejudicial to the defendant to some degree. *Vance*, 2011 Ark. 243, 383 S.W.3d 325.

As stated above in our discussion of the rape-shield statute, circuit courts have broad discretion regarding evidentiary rulings, and when reviewing a ruling on the admissibility of evidence, the circuit court will not be reversed absent an abuse of that discretion. *Owens v. State*, 363 Ark. 413, 214 S.W.3d 849 (2005). Abuse of discretion is a high threshold that

does not simply require error in the circuit court's decision but requires that the decision was arbitrary and groundless. *See Teater v. State*, 104 Ark. App. 268, 290 S.W.3d 623 (2009).

Of the statements Lester sought to exclude in his pretrial motion, the court deemed two inadmissible,[5] and one was admitted as modified.[6] Lester appeals the court's decision to admit the following four statements as follows:[7]

> c. "But at some point this became a rape and this was something that was not wanted by this other party. Okay?

> d. "Then no, it's not normal. Haldol is a serious, serious, anti-psychotic."

> e. "Okay. So he, he could, I'm really trying to, I'm not trying to be an asshole, but on Haldol you could've stuck a chainsaw up his ass and he wouldn't have said anything. You see what I'm saying."

> g. "I can tell by looking at you that you know some of this wasn't, it wasn't right. He was held against his will. At some point it changed from play to something that was more serious"

---

[5] b. "Cause at some point this thing turned beyond sex and turned into something unnatural, okay."
 h. "Do you know how, look I'm not trying to be judgmental but this, this sounds like, this is crazy sounding to me, like you're gonna transform a human into being like a dog and just let him…"

[6] Lester does not appeal the admission of modified statement "f." ("Well, I've seen guys my size, your size, they give 'em a shot, of course, you know when they're losing their mind, and one, two milligrams and they're just puppies, pardon the pun.")

[7] Lester does not appeal the admission of statement "a." ("If Astro's the one that initiated all of this crap, then that's fine, you know, we'll go after Astro.")

Lester argues that none of the above statements have any tendency to make the existence of any fact of consequence more or less probable than it would be without the statement. Alternatively, he contends that even if the statements are relevant, each is unfairly prejudicial. We find no error in the circuit court's evidentiary rulings.

It is apparent from the lengthy discussion between the court and counsel at the pretrial hearing that the circuit court clearly did not act improvidently, thoughtlessly or without due consideration. The court stated, "I don't see anything particularly out of the ordinary . . . at this point, I wouldn't keep it out. I reserve the right to see how the evidence comes in, and if something else effects this decision then I may change my opinion." In contrast, the court ruled that statement "b" was "inadmissible because it hasn't been shown to be relevant, first. And secondly, if it is relevant its prejudice to the Defendant outweighs any probative value[.]" The court determined that statement "c" was admissible, stating that "off the top, just looking at that I don't see that's anything wrong. The alleged crime is rape and consent is the other topic that's mentioned, so do you care to make any further argument?" After hearing counsels' arguments, the court concluded that the jury could weigh the statement for itself, and it was admitted. Regarding statement "d," the court asked counsel "Do you think there's anybody on the jury that's going to think that's normal? I don't see any prejudice because it's not normal for anybody to give—it's against the law for anybody to give a prescription drug . . . to another person." Statement "e" was also admitted after the court heard argument regarding its relevance and potential prejudicial effect, concluding that "[i]t's to get a reaction and to try to get a confession is what they are trying

to do." The court found that statement "f" must be "edited" because "there's no reason to put that, pardon the pun, phrase in. That's offensive." Regarding statement "g," the court determined that "there's nothing over the top offensive about this one. So I'm going to admit [g] and in that same vein I do find [h] is over the top offensive."[8]

In light of the discussion above, it is clear that the circuit court's decision was not arbitrary or groundless. The court carefully considered Lester's argument regarding each statement; thus, the circuit court properly exercised its discretion in admitting the statements. We affirm.

Affirmed.

ABRAMSON and THYER, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christian Harris*, Sr. Ass't Att'y Gen., for appellee.

---

[8]h. "Do you know how, look I'm not trying to be judgmental but this, this sounds like, this is crazy sounding to me, like you're gonna transform a human into being like a dog and just let him. . . ."